**UNITED STATES of America ex rel. Samuel SAIKEN, Plaintiff-Appellee,**

v.

**Peter B. BENSINGER, Director, Department of Corrections, State of Illinois, et al., Respondents-Appellants.**

**No. 72–2049.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1973.

Decided Nov. 16, 1973.

William J. Scott, Atty. Gen., James B. Zagel and Thomas E. Holum, Asst. Attys. Gen., Chicago, Ill., for respondents-appellants.

Peter Georges, John J. O'Toole, Chicago, Ill., for plaintiff-appellee.

Before KILEY, FAIRCHILD, and SPRECHER, Circuit Judges.

FAIRCHILD, Circuit Judge.

This is an appeal from an order granting a writ of habeas corpus releasing petitioner Samuel Saiken from state custody. Many of the facts appear in the opinions of the district court, Saiken v. Elrod, 350 F.Supp. 1156 (N.D.Ill., 1972) and of the Supreme Court of Illinois, affirming the conviction which resulted in his being in custody. People v. Saiken, 49 Ill.2d 504, 275 N.E.2d 381

(1971), cert. denied 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796.

The district court concluded that the affidavit for the search warrant was insufficient and we agree. The state has raised another claim, that the fourth amendment did not require a warrant because of the character of the place where the search was conducted. This point was not discussed by the Supreme Court nor the district court. No one has questioned the application of the exclusionary rule in the situation here, i. e., to the use by one state in prosecuting an offense within its borders of evidence obtained by another state in the course of investigation of a possible offense within its borders, on an allegedly insufficient warrant.

### (1) *Was the affidavit for the search warrant sufficient?*

In Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court held that where an affidavit is based upon hearsay, as in the instant case, the magistrate must be informed of: (1) some of the underlying circumstances from which the informant concluded that the property sought was where the informant claimed it was, and (2) some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable.

Turning to the first prong of the *Aguilar* test, there is no statement in the affidavit indicating the manner in which Joel Saiken, the informant, came by his information. Nonetheless, the state urges that the affidavit attributes to the informant information of sufficient detail to enable the magistrate to infer that the informant gained his information by observation or other reliable means. See Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ Deference is to be given to the magistrate's determination of probable cause. Jones v. United States, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697

(1960). We think that the magistrate could reasonably determine from within the four corners of the affidavit that the informant's representation was based upon more substantial information than "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli, supra,* 393 U.S. 416, 89 S.Ct.; United States v. Nasse, 432 F.2d 1293, 1300 (7th Cir., 1970), cert. denied 401 U.S. 938, 91 S.Ct. 927, 28 L.Ed.2d 217. The informant supplied details about sex and age of the body, its location, and the description and ownership of the farm. Assuming credibility of the informant, one could readily infer that he either was present at the burial or was relating a report which he had reason to believe was based on observation.

■ The more difficult question is whether the second prong of *Aguilar,* with such liberalization as may be read from United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), has been satisfied. Did the affidavit describe some of the underlying circumstances from which the affiant concluded that the informant was credible?

The affidavit held sufficient in *Harris* did not aver previous experience with the informant as a basis for affiant's conclusion that the informant was credible. It did contain four elements: (1) affiant's statement that on interview he had found the informant to be prudent, (2) attribution to the informant of personal and recent observations of the suspect's criminal activity, (3) corroboration of the informant's report by reason of affiant's knowledge of the suspect's reputation for activity of the type reported, (4) the informant's admission against penal interest in his disclosure that he had participated in the suspect's criminal activity. Three justices joined in emphasizing the presence of the four elements, although it is not clear that they would have required all four. Another justice relied on (1), (2), and (3). Another agreed with the conclusions as to (4), but also considered the affidavit

"as a whole." All five agreed on the ultimate proposition that the affidavit was sufficient. Four deemed it insufficient.

In United States v. Unger, 469 F.2d 1283 (7th Cir., 1972), cert. denied 411 U.S. 920, 93 S.Ct. 1546, 36 L.Ed.2d 313, we noted that *Harris* suggests a more flexible approach and held an affidavit sufficient. The affiant officer characterized the informant as a "citizen" who had contacted the officer, explained that the informant had occasion to be in the premises while working at his occupation, set forth in great detail the items of property observed, and stated that the citizen pointed 'out the building and gave the officer a diagram of the relevant area of the interior. We read some implication into the affiant's description of the informant as a "citizen" who came forward to give information, gained in the course of his employment, to the police, without appearance of spite or self-interest, and we felt that the close observation and detail described could be given weight in determining credibility.

In the instant case, as in *Unger,* the affiant did not specifically express his belief in the informant's credibility although he said he had good reasons to and did believe the facts set forth. As in *Harris* and *Unger,* this affidavit contains considerable detail, but it does not show that the informant gained his knowledge by observation or some other reliable way, it does not state information known to affiant and tending to corroborate the informant's report, and there is no admission against penal interest unless one assumes the unasserted fact that the informant disclosed that he had participated in the unlawful burial or concealment.

We agree with the Supreme Court of Illinois that informant's disclosure of his participation in the burial would constitute an admission against his penal interest as well as an explanation of the manner in which he obtained his knowledge. 275 N.E.2d at 386–387. Our difficulty, however, lies in the fact that this information was not set forth in the affidavit, and the state does not contend here that any information not in the affidavit can be relied upon as having been considered by the magistrate. See *Aguilar, supra,* 378 U.S. p. 109, footnote 1, 84 S.Ct. 1509.

The affidavit does disclose the name of the informant, Joel Saiken. It also discloses that the owners of the property are Sam and Minnie Saiken. The state argues that the identity of the surnames is a basis for the conclusion that the informer would have reason to know of the burial. Perhaps relationship would be a reasonable inference if the name were not common in the particular area. It seems speculative, however, to infer knowledge from relationship. With respect to the credibility prong of *Aguilar,* the more difficult problem here, it might be reasonable to suppose that a family member in good standing would not tell the police of a hidden body on the family farm unless it was there. But identity of surname does not establish either the degree of relationship or that the individuals are on good terms.

We conclude that the district court correctly decided that the affidavit was an insufficient foundation for the warrant.

**(2)** *Was the search within the curtilage of petitioner's dwelling?*

The state contends that even if the search warrant is inadequate, the challenged evidence is admissible because the search and seizure complained of occurred beyond the curtilage of the petitioner's residence and accordingly does not come within the fourth amendment's proscription against unreasonable searches and seizures.

The fourth amendment protects "[the] right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court held that this protection does not extend to "the open fields." The test traditionally used

has been whether the search occurred within the curtilage. In applying this test courts have traditionally considered "the proximity or annexation [of the place searched] to the dwelling," "the inclusion [of the place searched] within the general enclosure surrounding the dwelling," and the "use and enjoyment [of the place searched] as an adjunct to the domestic economy of the family." Care v. United States, 231 F.2d 22, 25 (10th Cir., 1956), cert. denied 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461. See Wattenburg v. United States, 388 F.2d 853, 856–857 (9th Cir., 1968) and cases cited therein.

■ In Jones v. United States, 362 U.S. 257, 266–267, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960), the Supreme Court emphasized the undesirability of importing into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle common law property distinctions. In Katz v. United States, 389 U.S. 347, 350–353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1969) the Court declined to deal with a problem of electronic surveillance in terms of the type of area and the law of trespass, but found a constitutionally protected entitlement to privacy of conversation within a public telephone booth. These cases caution a court to be alert, in applying the traditional curtilage test, to considerations which would make reasonable a constitutionally protected entitlement to privacy regardless of the area involved. Even so, we do not equate an individual's interest in effective concealment of evidence of crime with entitlement to privacy for the purposes of the fourth amendment. See Wattenburg v. United States, *supra*, 388 F.2d 857–858; United States v. Minker, 312 F.2d 632, 634 (3rd Cir., 1962).

■ Petitioner asserts that we should not consider the curtilage issue because that issue is not properly before this court. We disagree. Although neither party raised this issue in the state trial court, the judge called a witness to testify about the physical layout of the Saiken farm and held in the alternative that the search occurred within an "open field." Petitioner also offered proof on this issue. In the appeal to the Illinois Supreme Court, both parties briefed the curtilage question. The Illinois Supreme Court deemed the search warrant valid and affirmed the conviction without discussion of the curtilage issue. People v. Saiken, *supra*. In the federal habeas corpus proceeding, the state alleged that the body was not found within the curtilage of the farm; but for some reason, no evidence was offered on this issue by either party. On motion of the state, we granted leave to file the record of the state proceedings as an exhibit on appeal.

An analysis favorable to petitioner would be that the state had the burden, in defending against the habeas petition in federal district court, not only of pleading, but also of producing evidence that the character of the place searched was such that no warrant had been necessary. As a result the state might be foreclosed by waiver from urging the claim in this court. Another arguably correct analysis would be that it was petitioner's burden in order to obtain habeas relief, to plead and prove facts showing that a warrant had been required as well as facts showing the warrant invalid.[1] Under the circumstances it is unsatisfactory to decide the question on the ground that the party with the burden waived. It would especially be undesirable from the point of view of judicial economy if the analysis unfavorable to the petitioner were adopted, since he would be at liberty to petition anew.

The state court record reveals testimony at least indicating that the body was found in an open area. The twenty-acre tract has often been referred to as a farm. The record is unclear as to the distances between the various structures

1. There seems to be no question but that petitioner had exhausted his state remedy in this respect as well as the claim of invalidity of the warrant.

and the location of the body, the occupancy of buildings and trailers, and other relevant matters. The crucial question is left in great doubt.

It is evident that the officers did a considerable amount of digging before finding the body. Questions of the existence of liability for damages for such interference with property are not before us. If a constitutionally protected entitlement to privacy can not be established otherwise, we are not prepared on this record to say that digging beneath the surface of the soil establishes it.

We think the curtilage issue should be decided by the district court after the facts have had further illumination. If it be decided that a warrant was required, petitioner will be entitled to release, since it has been established that the warrant was issued on an insufficient affidavit. The district court is at liberty to continue petitioner on bail, pending decision.

The judgment granting the writ of habeas corpus is vacated, and the cause remanded for further proceedings.

SPRECHER, Circuit Judge, (concurring in part and dissenting in part).

I concur in the remanding of the cause for further proceedings regarding the curtilage question, but I dissent from that part of the majority opinion which holds that the affidavit was an insufficient foundation for the warrant because I believe that the opinion pushes the exclusionary rule to its ultimate "ridiculous lengths." I believe that this is the first case in which a murdered body is to be suppressed by operation of the rule.

Cardozo stated the extreme case hypothetically in People v. Defore, 242 N.Y. 13, 21, 23–24, 150 N.E. 585, 587, 588 (1926):

"The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is

found. . . . The privacy of the home has been infringed, and the murderer goes free."

Mr. Chief Justice Burger commented upon Cardozo's hypothetical horrible extreme while a Circuit Judge in Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241, 259 (1962) (dissenting):

"If indeed the evidence relating to the body of a homicide victim is to be excluded because of the manner of its discovery, we will have achieved the distinction of fulfilling Cardozo's prophetic warning that, once adopted, the Suppression Doctrine might some day be carried to these ridiculous lengths. Cardozo did not really believe this could happen; he was indulging in a form of judicial hyperbole to make a point. It is inconceivable that judges would go to such lengths ignoring a reasonable balance between individual rights and protection of the public."

Inasmuch as the majority opinion in *Killough* did not expressly pass upon the suppression of the body as "fruit of the poisonous tree" and remanded that case for a new trial, Mr. Chief Justice Burger in his dissent in Bivens v. Six Unknown Named Agents, 403 U.S. 388, 413, n. 3, 91 S.Ct. 1999, 2013, 29 L.Ed.2d 619 (1971) said that

"What Cardozo suggested as an example of the potentially far-reaching consequences of the suppression doctrine *was almost realized* in Killough. . . ." (emphasis added).

It has been fully realized for apparently the first time in the portion of the majority opinion which finds that the district court correctly decided that the affidavit was an insufficient foundation for the warrant and consequently suppressed the body of a murdered girl.

This case involved a particularly brutal murder of a 17-year old girl who "was a friend" of both a father and his son. The son, Joel Saiken, accused his father of the murder and the father,

Samuel Saiken, accused the son.[1] People v. Saiken, 49 Ill.2d 504, 275 N.E.2d 381, 383, 384 (1971). The body was found buried on the father's farm in Indiana after the son told a police officer the specific place where he had buried it after his father admitted to him that he had killed the girl.

A search warrant for the body was issued by an Indiana Justice of the Peace, based upon a police officer's affidavit, which in pertinent part recited that

". . . by virtue of information voluntarily conveyed to him by one JOEL SAIKEN . . ., affiant has good reasons to believe, and does believe, that a dead human body, to-wit: a white, female approximately seventeen (17) years of age is secreted in and about the following real estate in Porter County, Indiana:

[Complete legal description of 20-acre farm]

said real estate being the property of Sam D. and Minnie Saiken, said dead body being secreted in the following place and manner, to-wit: [specifying location behind goose house]."

The body was found by the police, digging at the specified location.

The father was indicted for murder and conspiracy to obstruct justice. A jury returned a verdict of not guilty on the murder charge but found him guilty of obstructing justice. He was sentenced to a term of not less than two nor more than three years. The conviction was affirmed by the Supreme Court of Illinois in People v. Saiken, *supra*, which concluded at 275 N.E.2d at 386–387:

"In the case at bar, the informant, Joel Saiken, personally saw or perceived the facts asserted. He buried the body. A number of facts are recited as to the location of the body, . . . . The remaining question is whether there is a basis presented in the affidavit to suggest that the informant is honest in what he has said. The assertions of the informant—that he buried and hid a dead body—constitutes an admission of his implication in a crime, which is sufficient to lend credence to what he has said. We believe there was substantial basis for crediting the hearsay information, and that the search warrant was properly issued upon the affidavit."

However, the district court, in granting Samuel Saiken's petition for habeas corpus, said in United States ex rel. Saiken v. Elrod, 350 F.Supp. 1156, 1158 (N.D.Ill.1972):

"It is apparent that the Justice of the Peace must have issued the search warrant because of knowledge or information which he obtained outside of the four corners of the document. Either he knew or was told or surmised that the informant was the defendant's son and therefore may have been reliable. Also he must have known or surmised that the informant was involved in a crime and was making an admission against his interest in the affidavit. Further, he must have surmised that the informant had been on the scene when the body was buried or had received this information from a reliable source, such as his father. None of this appears from the face of the warrant, however, and therefore none of it can properly be considered in determining the reasonableness of the Justice of the Peace's determination of probable cause."

The majority opinion finds that the first prong of the Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) test ("the magistrate must be informed of . . . some of the underlying circumstances from which the informant concluded that the property

---

[1]. In Coolidge v. New Hampshire, 403 U.S. 443, 445, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), involving the "particularly brutal murder" of a 14-year old girl, sweepings taken from the defendant's car were suppressed but the cause was remanded for a new trial and there was substantial evidence in addition to the sweepings.

sought was where the informant claimed it was") was met:

> "The informant supplied details about sex and age of the body, its location, and the description and ownership of the farm. Assuming credibility of the informant, one could readily infer that he either was present at the burial or was relating a report which he had reason to believe was based on observation."

But the majority finds that the second prong—"some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable"—is lacking in this case.

We must begin with the observations made in United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed. 2d 684 (1965):

> "These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

Second, in United States v. Unger, 469 F.2d 1283, 1286–87, n. 4 (7th Cir. 1972), we emphasized the inherent reliability of an eyewitness, victim or "citizen" as opposed to the ordinarily criminally-oriented government informant.

The very fact that a person named Saiken was giving specific information about property owned by two people named Saiken leads to the strong inference that the informant was either an eyewitness, victim or citizen [2] and not a professional informer inasmuch as it would be incredible that the similarity in names was a pure coincidence.

Third, the courts have had no difficulty whatever in finding an informer's reliability when he or she is a relative of the person who is the target of the search warrant. Parker v. United States, 407 F.2d 540 (9th Cir. 1969); United States v. Brown, 455 F.2d 1201 (9th Cir. 1972). The similarity in names in the present case gives rise to the inference that the informant was related in some way (whether son, father, brother, cousin) to the target of the search warrant. Presumably the reliability of the informer here would have been fully established if Joel had been characterized as "son" or Samuel as "father."

Finally, I would apply these principles in this case to avoid reaching the ultimate Cardozo horror of permitting a murderer or an obstructor of justice to go free because of a hyper-technical reading of the text within the four corners of a search warrant affidavit.

This case, much more so than the one in which the quotation was first used, "illustrates graphically the monstrous price we pay for the exclusionary rule in which we seem to have imprisoned ourselves." Coolidge v. New Hampshire, 403 U.S. 443, 493, 91 S.Ct. 2022, 2051, 29 L.Ed.2d 564 (1971) (Mr. Chief Justice Burger dissenting).

I would vacate the order granting the writ of habeas corpus.

2. Or a perpetrator or co-perpetrator, in which case an admission of crime carries its own indicia of credibility. United States v. Harris, 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).