638 P.2d 191 (1981)
G.R., Appellant,
v.
STATE of Alaska, Appellee.
Brian WARING, Appellant,
v.
STATE of Alaska, Appellee.
Scott P. ROBINSON, Appellant,
v.
STATE of Alaska, Appellee.
Nos. 5084, 5094 and 5110.
Court of Appeals of Alaska.
December 24, 1981.
*193 Lloyd I. Hoppner, James H. Cannon, Rice, Hoppner, Ingraham & Brown, Fairbanks, for appellant G.R.
Mary E. Greene, Asst. Public Defender, Fairbanks, and Brian Shortell, Public Defender, Anchorage, for appellant Waring.
James D. DeWitt, Call, Haycroft & Fenton, Fairbanks, for appellant Robinson.
James P. Doogan, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Robert G. Coats, Asst. Atty. Gen., Fairbanks, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.
Before BRYNER, C.J., SINGLETON, J., and ROWLAND, Superior Court Judge.[*]

OPINION
BRYNER, Chief Judge.
These consolidated appeals arise from an incident in which all three appellants were involved. Appellants Brian Waring and Scott Robinson were indicted for one count each of burglary in a dwelling, AS 11.20.080, and for one count of receiving and concealing stolen property, AS 11.20.350. A petition to adjudicate G.R. a delinquent minor was filed on the same charges. Appellants *194 moved for suppression of most of the evidence against them and the motions were denied by the superior court. Appellants were convicted and sentenced following separate court trials, and from those convictions appeal.

STATEMENT OF FACTS
On April 30, 1979, at about 1:30 a.m., State Troopers McGinnis and Ochs were on their way to investigate a reported traffic hazard on Sheep Creek Road outside of Fairbanks. En route, they saw three men standing next to a parked car in a deserted turnout along the road and stopped to investigate. As the troopers approached the car, two of the young men got down underneath it and appeared to be inspecting it. Trooper McGinnis asked one of them, T.C., a minor, if anything was wrong; T.C. said they had a problem with the tie rods on the car, but that they did not need assistance.
Trooper McGinnis became suspicious of the way the men were acting. He asked them to produce identification; they did. He also checked the vehicle registration to be sure the car wasn't stolen. T.C. was looking nervously into the woods, and on a "lucky guess," McGinnis asked him what the other people were doing in the woods. T.C. hesitantly told him that the owner of the car, Brian Waring, and Scott Robinson were in the woods at their cabin. McGinnis asked T.C. to show him where the cabin was, and T.C. led him and Trooper Ochs down to a stream at a point where there was a log crossing. McGinnis told the other two young men, G.R. and Randy Robinson, to stay by the car.
When McGinnis reached the stream, he was met by a shout from the other side: "If you take another step I'm going to blow your heads off." McGinnis identified himself as a state trooper, shone his flashlight over himself and his uniform, and then shone it across the stream. He saw appellants Waring and Scott Robinson there, and saw that one of them was holding a rifle. He could also see the cabin without the aid of the flashlight. When appellants were spotted, they ran away from the bank, Waring around to the back of the cabin and Robinson inside.
McGinnis ordered T.C. to stay where he was, asked Ochs to cover him, and crawled over the log crossing the stream, with his gun drawn. He went up to the cabin door, following no marked trail, and was met at the door by Waring. According to McGinnis, Waring said "Hi" and asked him in; according to Waring, the trooper opened the door, a visqueen curtain, and entered without knocking or asking permission.
McGinnis asked Waring where the gun was. Waring denied any knowledge of a gun and Scott Robinson suggested that it might have been a stick, so McGinnis called Ochs on the radio and confirmed that Ochs had also seen a rifle. McGinnis left the cabin and began searching the area around it. After a flashlight search, he found two guns, one a rifle in a case, approximately fifteen to twenty feet from the cabin, hidden out of view in some high grass on a knoll to the left of the cabin. McGinnis took the rifle out of its leather case, checked both guns to see if they were loaded, and radioed their serial numbers in to headquarters to see if they were stolen. He returned to the cabin and received a coded radio message that the rifle in the case had been stolen from a local house. He asked Waring and Scott Robinson, without giving them Miranda warnings, if they knew the guns were stolen. Waring said he knew the guns were stolen, but that he was keeping them for a friend who had brought them to Alaska.
McGinnis then suggested that they return to the cars, where he asked Waring a few more questions. McGinnis did all the interviewing himself, because Trooper Ochs was in training and was not allowed to conduct interviews. At this point a Sgt. Campbell arrived on the scene to assist. He was the only other trooper on patrol that night.
Then, at McGinnis' direction, they all returned to the station to continue questioning. McGinnis admitted at the suppression hearing that the young men would have been stopped if they had attempted to leave at that point. Waring drove his own car to *195 the station, accompanied by the two trooper vehicles, each carrying two of the other four young men.
The procession arrived at the station about 2:40 a.m., and the five young men were placed in separate rooms and questioned one at a time, initially for about fifteen minutes each. Each was given Miranda warnings before questioning. The parents of the young men were not notified, although the troopers were aware that T.C. and G.R. were minors. G.R., who was fifteen years old, was questioned for the first time at 4:00 a.m. On the first round of questioning, Trooper McGinnis became concerned that there was something the suspects were not telling him, but nobody confessed to anything, and the trooper could not articulate what he believed was being held back.
At about 4:30 a.m., a Mr. Bendock, the victim of a recent burglary, arrived to view the guns. He identified them as his and said they were stolen in the burglary. He also brought a knife and a lighter which he had found under the window where the burglars entered. Trooper McGinnis showed these items to Scott Robinson, who said that he thought they belonged to one of his brothers, either G.R. or Randy. Upon being shown these items, G.R. acknowledged they were his. McGinnis then brought Mr. Bendock in front of G.R. and had Mr. Bendock tell his story, whereupon G.R. confessed to the burglary. McGinnis did not advise G.R. of his Miranda rights again before the confession; he did do it before taking the story a second time, this time on tape.
Upon learning that G.R. had told the whole story, Scott Robinson and Waring both gave statements. T.C. and Randy Robinson were not implicated in the burglary and were therefore allowed to leave. The troopers then took the three appellants to their homes to gather additional evidence, and G.R.'s parents were first informed that he was in custody at about 9:30 a.m.
On appeal, the three appellants raise a number of issues, including the legality of the initial stop, the legality of the search for the guns, the necessity for Miranda warnings, the legality of the station house detention, and the voluntariness of G.R.'s confession. Additionally, the state raises the issue of whether Waring and Scott Robinson have standing to challenge the legality of G.R.'s confession. We shall deal with each of these issues in turn.

I. WHETHER THE REQUEST FOR IDENTIFICATION WAS AN IMPROPER SEIZURE OF THE PERSON.
Appellants G.R. and Scott Robinson argue that Trooper McGinnis acted without an articulable and reasonable suspicion of crime when he approached the three men standing by the car and asked to see their identification. Appellants assert that under Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the trooper's actions constituted an illegal seizure of the person of the three men.
We have considered the facts of this case in light of these two cases, as well as United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), and Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), which also involve investigatory stops. We have also considered the relevant Alaska line of cases, including Coleman v. State, 553 P.2d 40 (Alaska 1976), and Hintz v. State, 627 P.2d 207 (Alaska 1981). We conclude that under the facts here presented the actions of the trooper did not constitute a stop within the meaning of those cases.
The trooper saw three men standing by a stopped vehicle late at night on a deserted road. Under the circumstances it was not only reasonable, but, as the trial court found, part of the trooper's duty to stop and inquire if the men needed help. See Anchorage v. Cook, 598 P.2d 939 (Alaska 1979). Because the trooper's appraoch was reasonable and natural, the men had no objective reason to believe themselves constrained *196 to answer questions. Similarly, they had no reason to feel that their freedom of movement had been restrained by a show of authority by the officer, since they were not moving anyway and were in no way prohibited from going about their business. It was not improper or unduly restrictive in this context for the state trooper to further inquire as to the vehicle's ownership and registration, and to make sure the driver of the vehicle was licensed. In short, there was no objective manifestation of authority which the three could reasonably have felt compelled to obey or which could reasonably have made them believe that they were in any way stopped or restrained. See, e.g., Henry v. State, 621 P.2d 1 (Alaska 1980).
As Trooper McGinnis asked these preliminary questions, he observed nervous behavior on the part of T.C. and questioned him about it. T.C. apparently answered all subsequent questions voluntarily. The trooper had a right to be where he was at that time and to observe what went on around him, to ask questions without any show of authority, and to follow up on voluntary answers. See United States v. Mendenhall, 446 U.S. at 555, 100 S.Ct. at 1877-78, 64 L.Ed.2d at 510. We conclude that McGinnis' discovery of the cabin and the presence of Robinson and Waring was therefore not evidence obtained by means of an illegal stop or seizure.[1]

II. WHETHER THE SEARCH FOR THE GUNS WAS PROPER.
After McGinnis crossed the creek, he entered the cabin at Waring's invitation. When he did not see the rifle with which he had been threatened, he went to search in the direction where Brian Waring had run with the rifle. The search was warrantless and without consent. When he found the rifle on the ground with another gun about 15-20 feet from the cabin, he checked to see if the guns were loaded and radioed trooper headquarters to see if they were stolen.
If the actions of Trooper McGinnis are characterized as a search, they must fall under one of the "well-delineated" and "jealously drawn" exceptions to the warrant requirement. Schraff v. State, 544 P.2d 834, 838 (Alaska 1975). Appellants contend that this search does not fall under any exceptions to the warrant requirement; the state contends that it was permissible as a weapons search under Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968). However, the warrant requirement covers only those areas in which an individual maintains both a subjective and a reasonable expectation of privacy, such that constitutional protections should apply. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Smith v. State, 510 P.2d 793, 797 (Alaska 1973). We conclude that appellants here had no such reasonable expectation that the land around the cabin would be private.
It is clear that Waring had a subjective expectation of privacy in hiding the guns. He testified that it was his intent to hide them from the officer, and the state stipulated that they were not in plain view. There was also testimony that appellants attempted to maintain the privacy of the cabin and its environs. Appellants stipulated that they had no title to the land, and the trial court found that they were trespassing. The court also found that while the cabin itself was not a residence, the appellants occasionally lived or visited there. There was no yard or fence around the cabin, although some brush was cleared. The premises included a small garden, an outhouse, a fire pit, and a hold in the *197 stream which served as a refrigerator. Appellants testified that they occasionally sat on the side of the cabin where the guns were hidden.
Under these circumstances, the question is whether defendants' subjective expectation of privacy was one that society is prepared to recognize as reasonable. Woods & Rohde, Inc. v. State of Alaska, 565 P.2d 138, 149 (Alaska 1977); Nathanson v. State, 554 P.2d 456, 458 (Alaska 1976). Certain lands adjacent to a dwelling have always been protected by the fourth amendment, such as those falling within the "curtilage," generally defined to include the yard and outbuildings of a dwelling, depending on their use by the inhabitants. Wattenburg v. United States, 388 F.2d 853, 857 (9th Cir.1968). However, the viability of the "curtilage" test has been questioned since Katz, and most courts now attempt to determine those areas in which the person challenging the search has a reasonable expectation of privacy. Wattenburg v. United States, 388 F.2d at 857; United States v. Fluker, 543 F.2d 709, 716 (9th Cir.1976); People v. McClaugherty, 193 Colo. 360, 566 P.2d 361 (1977). See W. LaFave, Search and Seizure, § 2.4, at 331-338 (1978). See, e.g., Pistro v. State, 590 P.2d 884, 886-887 (Alaska 1979).
It is not necessary to decide whether trespassers may in some cases have a reasonable expectation of privacy in a structure built on another's property, since in this case the connection between the location of the guns and any private place is too remote. The guns were located at some distance from the cabin, outside of any structure. There was no yard or fence to differentiate the land around the cabin from the surrounding woods. The cabin itself was near a turnout on a public road and was located directly opposite a log crossing the stream. Assuming the land was public land, the appellants certainly could have no expectation that state troopers would not be walking in the vicinity of the cabin. Even if appellants believed the land to be private property, they were aware it was not theirs; they did not have the actual owner's consent and they had little reason to believe that others would not trespass as they had. See People v. Little, 33 Cal. App.3d 552, 109 Cal. Rptr. 196 (1973).[2] The search for the guns was therefore not a violation of appellants' fourth amendment rights.
Appellants also contend that the trooper acted illegally after finding the weapons by removing one of them from its case, opening both to see if they were loaded, and inspecting the weapons for serial numbers to see if they were stolen.[3]
Given the threat that led Trooper McGinnis to embark upon his search for a gun, and given our conclusion that his search did not violate appellants' constitutional rights, we believe that, once he found the guns, McGinnis was entitled to seize them, at least temporarily, for his own protection. We further believe that inspection and identification of the guns by the trooper was permissible upon their seizure. As to the weapon that was not in a case, the serial number was in plain view on its side, although the trooper may have had to pick up the weapon to see the number. Compare Elson v. State, 633 P.2d 292, 295-97 (Alaska App. 1981).
*198 As to the second weapon, since it was in an open case and since McGinnis was entitled to seize it, removal of the gun from its case for inspection was a reasonable precaution for him to take. Indeed, it would be foolhardy for an officer, trained in firearms safety, to seize and carry about a rifle, in an open case, without first checking to see if it was loaded, if the safety mechanism was on, or if any other potential for danger existed by virtue of the gun's condition. We believe that Trooper McGinnis, in this case, would have posed a potential danger to himself and to the persons in the cabin had he failed to check whether the rifle in the case was loaded after he had found it. Once the rifle was removed from its case, its serial number was in plain view. We find this case distinguishable from Erickson v. State, 507 P.2d 508 (Alaska 1973), where no danger to the officers arose from the presence of a locked suitcase suspected to contain marijuana, and where no exigency existed to justify warrantless entry of the suitcase. We thus hold that the search for and inspection of the guns were legal.

III. AT WHAT POINT WERE APPELLANTS TAKEN INTO CUSTODY SO AS TO REQUIRE MIRANDA WARNINGS?
Waring and Robinson contend that they were under custodial interrogation at the time McGinnis asked them if they knew the guns were stolen and were thus entitled to Miranda warnings[4] before interrogation. They argue that the evidence which flowed from Waring's acknowledgment that the guns were stolen and appellants' subsequent transportation to and detention at the station should be suppressed.
Appellants admit that the standard to be applied in determining whether the interrogation was custodial is that enunciated in Hunter v. State, 590 P.2d 888 (Alaska 1979). Hunter establishes an objective, reasonable person standard, to be applied on a case-by-case basis, for determining whether an investigation is custodial. The inquiry, in the absence of actual arrest, is whether police actions would lead a reasonable defendant to believe that he would not be allowed to leave or otherwise terminate the police contact. Id. at 895, adopting United States v. Hall, 421 F.2d 540, 545 (2d Cir.1969).
Examining those factors considered relevant in Hunter, we find that the questioning occurred in the appellants' own cabin where they were pursuing their own affairs, that the questioning was very brief with no air of hostility or coercion, and that only one officer was present with no weapon drawn. Absent here are any significant objective manifestations of a custodial setting. Although it is true that Waring at least was a likely suspect for receiving or concealing stolen property and that both Waring and Robinson were taken to the station afterward, no custodial interrogation results merely from questioning the defendant at home, or in the familiar home of another, nor is the fact that the defendant is the focus of suspicion determinative. Smith, The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation? 25 S.Car.L.Rev. 699, 719 (1974). We conclude that a reasonable person would have felt free to leave and break off the questioning that occurred in the cabin,[5] and therefore there was no need for Trooper McGinnis to give Robinson and Waring Miranda warnings.

IV. WHETHER TAKING APPELLANTS TO THE STATION FOR QUESTIONING CONSTITUTED AN ILLEGAL SEIZURE.
Appellants urge that Trooper McGinnis illegally detained them when he took them to the station for questioning, and thus their confessions should be suppressed as the fruit of the illegal detention. They argue that the trooper did not have probable cause to arrest them at that point, and thus the scope of the detention should be *199 governed by Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The state responds that it did have probable cause to arrest Waring and Scott Robinson for receiving and concealing stolen property, and that detention of the other suspects was reasonable under the circumstances.[6]
We conclude that McGinnis had probable cause to arrest Waring before leaving the cabin. Waring was observed by McGinnis to be holding a rifle which turned out to be stolen. He attempted to hide it, lied about possessing it, and then admitted that he knew it was stolen. At that point probable cause to arrest Waring and take him to the station plainly existed.
The trial court made no finding as to whether there was probable cause to arrest Scott Robinson or G.R. Robinson argues that the only evidence against him when he was taken into custody was that he ran when McGinnis identified himself and that he was in the presence of a person who admitted to possessing property he knew was stolen. G.R. argues that the trooper had no evidence, either by virtue of the circumstances or through his own admissions, to connect him with the stolen property.
While it would be possible for us to decide if there was probable cause to arrest G.R. or Robinson on the basis of the record before us, we believe it would be more appropriate to remand the question of probable cause to the trial court, which heard all the testimony presented at the suppression hearing. However, because the trial court ruled that the confessions were admissible based on an interpretation of the law that is now foreclosed by Dunaway v. New York, we will consider the further arguments raised by both parties regarding the suppression issue, which we believe we can do adequately based on the record as it stands.
The state argues that such a detention may be justified even without probable cause if it was reasonable under all the circumstances.[7] The state contends that the same balancing test used in Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1879-1881, 20 L.Ed.2d 889, 905 (1968), should be applied, weighing the justification for the need to detain the person against the interest invaded. The state asserts that its actions here were reasonable and necessary, due to the fact that it was cold and dark, McGinnis did not have his notebook, it would have been difficult to separate defendants to take their statements, no other troopers were available to assist, and there was an exigency to preserve destructible evidence, i.e., the suspects' statements before they had a chance to collaborate.
This same contention was clearly rejected in Dunaway v. New York under circumstances far more favorable to the prosecution. There, the police received information, insufficient for a warrant, implicating Dunaway in a murder. Dunaway was picked up by police and brought to headquarters for questioning. Although he was told he was not under arrest, he would have been restrained if he tried to leave. He was placed in an interrogation room and given Miranda warnings; he waived counsel and confessed within an hour. 442 U.S. at 203, 99 S.Ct. at 2251, 60 L.Ed.2d at 830. The United States Supreme Court held that the confession was obtained in violation of Dunaway's fourth amendment protections, *200 since he had been seized without probable cause.
Dunaway reaffirmed that probable cause is necessary for all arrests, and reiterated that even an intrusion as limited as a Terry stop is serious. Although Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), created an exception for a limited, on-the-street search for weapons, the Court in Dunaway treated this as sui generis and was careful to maintain its narrow scope. 442 U.S. at 209-210, 99 S.Ct. at 2254-2255, 60 L.Ed.2d at 834. The argument that there should be a multifactor balancing test of "reasonable police conduct under the circumstances" to cover all seizures which do not amount to full technical arrests was expressly rejected:
Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause... . [T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases... .
442 U.S. at 213, 99 S.Ct. at 2256-2257, 60 L.Ed.2d at 836. Thus, although we have found that appellant Waring was subject to arrest, we necessarily conclude that if there was no probable cause to arrest appellants G.R. and Scott Robinson, they were illegally seized when they were transported to trooper headquarters and detained for questioning.
After deciding that the seizure of a person was illegal in fourth amendment terms, there remains the question whether the connection between the unconstitutional police conduct and incriminating statements or other evidence obtained as a result of the illegal seizure was nevertheless sufficiently attenuated to permit the use at trial of the incriminating evidence. Dunaway v. New York, 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838; Cruse v. State, 584 P.2d 1141, 1145 (Alaska 1978). See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
[A]lthough a confession after proper Miranda warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis... .
Dunaway v. New York, 442 U.S. at 217, 99 S.Ct. at 2258-2259, 60 L.Ed.2d at 839 (footnote omitted), citing Brown v. Illinois, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 427 (1975).[8]
Brown v. Illinois identified several factors to be considered in determining whether a confession is obtained by exploitation of an illegal arrest: the use of Miranda warnings, the temporal proximity of the arrest and the confession, the presence of intervening events, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The burden of showing admissibility rests on the prosecution. Id. at 603-604, 95 S.Ct. at 2261-2262, 45 L.Ed.2d at 427. Applying these factors here, we find a close temporal proximity between the arrest and the confession: G.R. and Scott Robinson were arrested in the early hours of the morning and were held without interruption for questioning for two or three hours before G.R. confessed. They talked to no one other than each other and the state troopers. Assuming the arrest of G.R. and Robinson was without probable cause and therefore illegal, there was no intervening event which would be sufficient to dissipate the taint of the illegal arrest.
Although G.R. was confronted by the arrival of Mr. Bendock with incriminating evidence, this confrontation would not have occurred at this time and in this *201 manner but for the illegal arrest; it was a direct exploitation of G.R.'s illegal seizure. If the confrontation had occurred later, in G.R.'s home or in the presence of his parents, rather than in the middle of the night after several hours of police custody in the inherently coercive atmosphere of the police station, there is no certainty at all that G.R. would have confessed. His confession can also be traced to statements made by his brother Scott, himself illegally detained, linking G.R. with items left at the scene of the burglary. Similarly, G.R.'s confession did not provide an intervening event which would dissipate the taint of his brother's illegal detention, particularly since the series of confessions was initiated by Scott's identification of the items left at the scene.
The state contends, however, that consideration of the purpose and flagrancy of the official misconduct is a factor which outweighs the other aspects of this violation of appellants' rights. Since the exclusionary rule exists primarily to deter police misconduct, the state argues, the fact that the trial court found the police acted reasonably under the circumstances should be sufficient to make suppression of the confession unnecessary.
We reject this argument. Although the police behavior may have been reasonable, in the sense that it was not the product of bad faith or intentional impropriety, it nonetheless resulted in the arrest and detention of appellants Scott Robinson and G.R. To allow a simple reasonableness exception in finding attenuation determinations would render nugatory our holding that there is no general reasonableness exception applicable for taking suspects into investigatory detention. Furthermore, there was a quality of purposefulness to the detention here that was specifically disapproved in Brown and Dunaway. Trooper McGinnis testified that he wanted to continue questioning the suspects "to find out what was going on," and because "there was something they weren't telling" him; he had no particularized suspicion of wrongdoing or probable cause for arrest except as to Brian Waring. Such an interrogation is precisely the type of "`expedition for evidence' admittedly undertaken `in the hope that something might turn up'" specifically condemned in Dunaway v. New York, 442 U.S. at 218, 99 S.Ct. at 2259, 60 L.Ed.2d at 839, and Brown v. Illinois, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428. Thus, assuming again that there was no probable cause for the arrest of G.R. and Scott Robinson, we conclude that the reasons given by the state trooper for taking the four suspects other than Waring into custody were insufficient to dissipate the taint of an illegal arrest, and the confessions of G.R. and Scott Robinson must be suppressed if probable cause is not found.[9]

V. WHETHER WARING HAS STANDING TO ASSERT A VIOLATION OF HIS CO-DEFENDANTS' RIGHTS.
Waring argues that his confession should also be suppressed because it was the fruit of the illegal arrest and detention of G.R.; the state responds that Waring does not have standing to complain of the violation.
This area of standing is one which has not been specifically addressed in Alaska. The leading case on standing is Dimmick v. *202 State, 473 P.2d 616 (Alaska 1970), which dealt with the admissibility against a co-defendant of a confession obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Dimmick an evenly divided court affirmed a superior court ruling holding that evidence from a confession so obtained was admissible under common law against a co-defendant, at least so long as the confession was not the result of the kind of coercion which would repel a civilized and decent person. Dimmick v. State, 473 P.2d at 619.
In a forceful dissent, Justice Connor argued that standing should not be denied someone simply because the person was not a direct victim of a violation of constitutional rights. He argued that suppression of illegally seized evidence may be necessary no matter against whom it is eventually used, in order to protect the integrity of the judicial system and to advance the deterrent purposes of the rule against police misconduct. He advocated use of a balancing technique:
In my view the doctrine on standing should be balanced against the deterrent purposes of the exclusionary rule, and against the policies exemplified by the constitutional right in question. By such an approach we would avoid fixing an iron-clad demarcation of the line of constitutional protection, leaving to the future the problems of how far these guarantees of fundamental rights must be implemented to preserve a just and free society. By the balancing technique we would fulfill one of the great salutary purposes of the exclusionary rule.
Id. at 628. This dissent discussed the exclusionary rule in terms of both fourth and fifth amendment violations.
Subsequent to this decision, the supreme court adopted the Alaska Rules of Criminal Procedure, including Rule 26(g), which read:
Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness.[10]
The history and purpose of Rule 26(g) and the exclusionary rule in general were extensively discussed in State v. Sears, 553 P.2d 907 (Alaska 1976). In Sears the court considered whether to allow the fruits of an illegal seizure to be used at a probation revocation hearing. It concluded that although Rule 26(g) was a rule of general applicability, to be applied to all criminal proceedings, probation revocation proceedings were not part of the normal criminal process and were not subject to the rule. The court quoted the notes of the Criminal Rules Revision Commission, which drafted the rules in 1972:
Rule 26  Subsection (g) is proposed to make clear that the protections of the Miranda Rule are not eroded. See Harris v. New York, 401 U.S. 222 [, 91 S.Ct. 643, 28 L.Ed.2d 1] ... (1971) and the standing problem discussed in Dimmick v. State, 473 P.2d 616 (Alaska 1970). Note: It must [sic] emphasized that a split exists within our committee concerning the inclusion of proposed Rule 26(g) which reads:
`Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness.'

*203 The minority believe the police can be properly disciplined without turning criminals free. The majority adopt the reasoning of Justice Connor in Dimmick v. State, 473 P.2d 616, 625 (Alaska 1970) that it is important that the government obey the law as well as enforce it and by excluding otherwise probative evidence official misconduct is deterred. The minority would at least want an objective test as proposed by Justice Rabinowitz at page 622 in Dimmick.

It should be emphasized that Proposed Rule 26(g) is a substantial change. The majority consider the policy of the proposal can be decided in the abstract best since the pressure and publicity of an actual defendant whose conviction might be reversed are absent.
State v. Sears, 553 P.2d at 911. However, the court did not discuss the rule as it related to the problem of standing, using the commission's discussion of standing only to illustrate that the commission's reasons in drafting Rule 26(g) were unrelated to the scope of proceedings to which the rule would apply.
From Sears and the quoted commentary we learn that Rule 26(g) was drafted as an effort to deal with the problems raised in Dimmick. To that extent, the rule may well have been drafted with the intent not to require standing to assert violation of another's fifth amendment rights. It may also have been drafted with the intent to leave the question open to a case-by-case balancing interpretation, as suggested by Justice Connor in his dissent in Dimmick. In any case, neither Sears nor Dimmick deal specifically with the problem of standing to assert a violation of another's fourth amendment rights. Nothing in Rule 26(g) or in the commentary indicates whether that problem was even considered.
Evidence Rule 412 does not offer much additional guidance, although the commentary to the rule and the history of its adoption arguably give rise to an inference that the standing requirement was meant to be retained in search and seizure cases. In reference to the provision of Rule 412 that evidence may not be used in prosecution of perjury if it was "obtained in substantial violation of rights," the commentary to the rule notes: "The simple reference to `rights' is intended to emphasize that this section has no bearing on the law of standing in search and seizure cases." Alaska R.Evid. Commentary at 105. This passage of the commentary is particularly significant in light of the supreme court's close involvement with the drafting of Rule 412 and the commentary thereto.
The Proposed Alaska Rules of Evidence, prepared for the supreme court by Professor Stephan Saltzburg in 1976, contained the initial draft of Rule 412, which provided:
Evidence illegally obtained by the government shall not be used in a criminal proceeding against the person whose rights were violated for any purpose including the impeachment of a witness. [Emphasis added.][11]
Although this proposed rule  by expressly stating only that illegally obtained evidence could not be used "against the person whose rights were violated"  could be read as establishing a standing requirement, Professor Saltzburg's commentary did not address the standing question at all. See Proposed Alaska Rules of Evidence, Reporter's Comments, Rule 412 at 1-3. The Committee on Rules of Evidence, which was appointed by the supreme court to review Professor Saltzburg's proposals, took the position that the wording of Proposed Rule 412 affirmatively created a standing requirement. *204 Thus, Professor Saltzburg's proposed Rule 412 and an alternative proposal drafted by one of the committee's members were submitted to the supreme court by the commitmitted without endorsement or recommendation. The committee specifically noted its view that both of the proposals constituted substantial departures from former Criminal Rule 26(g), and that, since the policies behind the exclusionary rule were familiar to the court and were not evidentiary in nature, the court was in the best position to decide whether to retain the substance of former Criminal Rule 26(g) or to adopt one of the two new proposals. See Report of Action Taken By The Committee On Rules Of Evidence At Its Final Meeting, Rule 412. It is noteworthy that the final version of Rule 412 adopted by the supreme court differed markedly from the proposal submitted by the Committee on Rules of Evidence and from former Criminal Rule 26(g).
It might initially appear that the supreme court intentionally abandoned any standing requirement by deleting from Rule 412 Professor Saltzburg's proposed wording: "against the person whose rights were violated." However, had the court intended to abandon standing, it could easily have made its intent explicit in the commentary to Rule 412. Far from suggesting an abandonment of standing, the only relevant statement in the commentary specifically indicates that Rule 412 was meant to retain the law of standing intact in the area of search and seizure; this statement was added to the commentary by the court itself and was not contained in the comments to proposed Rule 412, as originally drafted by Professor Saltzburg. In this regard, the commentary to Rule 412 is consistent with the supreme court's discussion in State v. Sears, 553 P.2d at 911, which indicated that former Criminal Rule 26(g) was originally adopted to deal with the problem of standing in cases involving the fifth amendment right against self-incrimination, and not cases involving unlawful searches and seizures under the fourth amendment.
This review leads us to conclude that the traditional requirement of standing was not abrogated in search and seizure cases by the supreme court's adoption of Evidence Rule 412. There is little to indicate that the supreme court ever intended to alter the established law of standing in fourth amendment cases, and the commentary to Rule 412 affirmatively implies that the court intended to retain standing as a requirement. Waring must thus establish that he had standing to assert his constitutional claim in the present case. In the absence of any controlling Alaska law, we turn to federal decisions involving standing in search and seizure cases.
Recently, the United States Supreme Court considered standing to assert vicariously a violation of fourth amendment rights in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). There the Court refused to suppress a rifle found in the locked trunk of an automobile in which the defendants were passengers. The rifle was used as evidence in a robbery prosecution against the defendants, who owned neither the rifle nor the car. In rejecting the defendants' contention that they should have standing to challenge the search and seizure of another's property, the Court said:
We decline to extend the rule of standing in Fourth Amendment cases in the manner suggested by petitioners. As we stated in Alderman v. United States, 394 U.S. 165, 174, 89 S.Ct. 961 [966-967], 22 L.Ed.2d 176 (1969); `Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.
*205 439 U.S. at 133-34, 99 S.Ct. at 425, 58 L.Ed.2d at 394-95 (citations and footnote omitted).
The Court analyzed the case in terms of the defendants' reasonable expectation of privacy in the place searched and the items seized, as a matter of substantive fourth amendment law, and not by reference to any theoretically separate concept of standing.
Analyzed in these terms, the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.
439 U.S. at 140, 99 S.Ct. at 429, 58 L.Ed.2d at 399.
It should be emphasized that nothing we say here casts the least doubt on cases which recognize that, as a general proposition, the issue of standing involves two inquiries: first, whether the proponent of a particular legal right has alleged `injury in fact,' and, second, whether the proponent is asserting his own legal rights and interest rather than basing his claim for relief upon the rights of third parties.
439 U.S. at 139, 99 S.Ct. at 428, 58 L.Ed.2d at 398.
Applying the principles enunciated in Rakas, we conclude that the interest asserted by appellant Waring in arguing for suppression of the confessions of his co-defendants is not one which the fourth amendment was designed to protect. Because fourth amendment rights are personal rights, Waring had no reasonable expectation of privacy or personal integrity that was infringed by the unlawful arrest of Scott Robinson or G.R. He had no protectable expectation that G.R. might not at some point be seized, illegally or not, and as a result of that seizure confess and implicate his accomplices. As one who has no interest in the property searched has not had his personal rights violated, so one who is not himself the subject of an illegal seizure which leads to incriminating evidence cannot complain solely on the basis that the seizure of another was unlawful.
It is evident that Waring can base his claim for relief only upon the rights of G.R. and Scott Robinson, and not upon his own legal rights and interests. Waring's own confession was found by the superior court to have been voluntary, a conclusion with which we agree. Because Waring's arrest was based on probable cause, his own detention was not illegal, and his challenge to the validity of his own confession rests entirely on an assertion of Robinson's or G.R.'s rights. See United States v. Barber, 557 F.2d 628, 633-34 (8th Cir.1977). We conclude that neither G.R. nor Robinson's confessions need be suppressed under the exclusionary rule in order to vindicate Waring's fourth amendment rights.[12]
We therefore REMAND this case as to Scott Robinson and G.R. If the superior court, upon remand, finds no probable cause existed to arrest Scott Robinson when he was transported to trooper headquarters, his conviction must be reversed; the same holds true for G.R. We will retain jurisdiction of the case, in the event that the court finds there was probable cause for the arrest of either or both of these appellants.
The conviction of Brian Waring is AFFIRMED.
COATS, J., not participating.
NOTES
[*] Rowland, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.
[1] Appellants argue that there was an illegal search for the cabin, but this argument has no merit. We have concluded that no illegal stop or seizure occurred in questioning T.C., and appellants do not contend that his answers were in any other sense involuntary. He led the trooper to the cabin upon request. Furthermore, the cabin was built on land which was either public or belonged to an unknown third party; the court found that appellants were trespassing. Under these circumstances appellants had no reasonable expectation of privacy in the location of a cabin built on property not theirs. See, e.g., Nathanson v. State, 554 P.2d 456 (Alaska 1976): People v. Little, 33 Cal. App.3d 552, 109 Cal. Rptr. 196 (1973).
[2] Other courts have applied a balancing test to this situation to determine the reasonableness of the search, weighing the extent of the intrusion on a reasonable expectation of privacy against the justification for the search. See Wattenburg v. United States, 388 F.2d at 858; People v. Doerbecker, 39 N.Y.2d 448, 384 N.Y.S.2d 400, 348 N.E.2d 875 (1976). If we examine the balance here, we find that although the search was somewhat intrusive, being done at night by flashlight, the appellants' reasonable expectation of privacy was likewise minimal. Given that the trooper was confronted by two individuals in a remote area, had just been threatened with the gun for which he was searching, and had an interest in protecting himself, we would conclude that the justification for the search outweighed the intrusion on any expectation the appellants may actually have had.
[3] The weapon in the case was determined to have been stolen while the trooper was still at the cabin.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Appellants made no incriminating statements between leaving the cabin and arriving at the station, where they were given Miranda warnings.
[6] The state does not argue that the suspects were not in custody at the station, and we find that they were. Henry v. State, 621 P.2d 1 (Alaska 1980), is distinguishable. Henry was found not to be in custody when he responded affirmatively to a police request to go down to the station for fingerprinting. He rode unrestrained in the front of the police car, was not questioned about the crime en route or upon arrival, and was told that he was free to leave. Id. 621 P.2d at 2. Here, in contrast, the suspects, having been given no choice, were returned to the station in a caravan, were placed in separate rooms and questioned over a period of two to three hours, and, according to the testimony of Trooper McGinnis, would have been stopped if they had tried to leave.
[7] We do not address the issue of whether either G.R. or Scott Robinson could properly be arrested at the cabin as material witnesses, since the state did not raise the issue either at trial or on appeal. Cf. Bacon v. United States, 449 F.2d 933, 943 (9th Cir.1971) and AS 12.30.050.
[8] The trial court found the confessions of Waring, Robinson and G.R. to be knowing and voluntary for the purposes of the fifth amendment. The trial court specifically found that G.R. was properly advised under Miranda, understood his rights as well as any of the appellants, had received Miranda warnings before, and was a sophisticated young adult. We concur with the trial court's determination, having independently reviewed the record on the issue of voluntariness.
[9] The trial court found that by keeping the minor G.R. in custody without notifying his parents, the troopers were in violation of Alaska Children's Rule 6(b), which provides for immediate parental notification of custody. G.R. argues that his confession was illegal and involuntary because it was obtained in violation of this rule. The trial court concluded that G.R.'s confession was voluntary and that violation of the rule did not require suppression of the confession.

We do not need to decide if the confession is separately suppressible on these grounds. We note that in Quick v. State, 599 P.2d 712, 718 (Alaska 1979), the supreme court rejected an argument that any juvenile confession to be voluntary requires the informed guidance of an adult, and held instead that voluntariness should be determined by examination of the totality of the circumstances. See also Troyer v. State, 614 P.2d 313 (Alaska 1980). However, it does not appear that the applicability of Children's Rule 6(b) was brought to the court's attention in those cases. Also, in Quick the court found the defendant was not in custody when he confessed. 599 P.2d at 717.
[10] Criminal Rule 26(g) was superceded on August 1, 1979, by Alaska R.Evid. 412, which reads:

Evidence illegally obtained shall not be used over proper objection by the defendant in a criminal prosecution for any purpose except:
(1) a statement illegally obtained in violation of the right to warnings under Miranda v. Arizona, 384 U.S. 436, [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), may be used in a prosecution for perjury if the statement is relevant to the issue of guilt or innocence and if the prosecution shows that the statement was otherwise voluntary and not coerced; and
(2) other evidence illegally obtained may be admitted in a prosecution for perjury if it is relevant to issue of guilt or innocence and if the prosecution shows that the evidence was not obtained in substantial violation of rights.
The suppression hearing in this case was held on July 26-27, 1979; oral arguments on the motion were held and findings were made on August 24, 1979, and Waring was sentenced on October 22, 1979. The question of Waring's standing to assert the issue was apparently not raised below.
[11] Professor Saltzburg's draft of the Proposed Alaska Rules of Evidence was first submitted to the supreme court in November, 1976. On October 4, 1978, the Committee on Rules of Evidence submitted to the supreme court a revised draft of the proposed rules, together with the committee's recommendations and a compilation of correspondence, documents and other materials tracing the committee's work and explaining its recommendations. The various documents referred to in this discussion of the history of Rule 412 were all included in the materials submitted to the supreme court by the committee on October 4, 1978. See Report to the Alaska Supreme Court by the Committee on Rules of Evidence (October 4, 1978).
[12] There are no circumstances here, as there were in Dimmick v. State, to suggest that application of the exclusionary rule as to Waring would serve any deterrent purpose not fully served by Scott Robinson's and G.R.'s assertion of their own rights. Accordingly we are not called upon to decide whether the rule of standing should be flexibly applied in differing circumstances, nor do we express any opinion on this issue. Similarly, our holding with respect to standing is restricted to the area of fourth amendment violations presented by this case, and we do not address the question of the extent to which vicarious assertion of fifth amendment violations can be permitted under Rule 412.