**Matthew M. UNGER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Gregory Earl CAROTHERS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. 5287, 5330.**

Court of Appeals of Alaska.

Feb. 11, 1982.

---

James D. Oswald, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant Unger.

Leonard T. Kelley, Anchorage, for appellant Carothers.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., and COATS, J., and BLAIR, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

On December 18, 1978, Gregory Carothers and Matthew Unger decided to commit a pair of armed robberies to raise some money for Christmas presents. They flipped a coin to see who would go first. Carothers then approached a woman · in a shopping center parking lot in Anchorage, pointed a gun at her, and successfully demanded her purse. Unger repeated this procedure a few minutes later at another parking lot,

---

* Blair, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16, of the Constitution of Alaska.

but this time was chased by the woman's husband, who noted the license plate number of the car as the robbers sped away.

The car was identified as belonging to Carothers, and the second victim's husband picked Carothers out of a photo lineup as having a hairline similar to the man he had seen. On December 19, at about 5:00 p. m., the police made their first substantial effort to locate Carothers. Carothers' sister informed the police that he had moved out of his parents' house and was probably staying with Matt Unger. Officer Coffey of the Anchorage Police Department and Warrant Officer McMillon, a state trooper, went to Unger's house. The officers did not have a warrant to arrest Carothers, and, at the time, they were not aware that Unger had been involved as Carothers' accomplice.

Officer Coffey knocked on the door of Unger's apartment and Unger opened it. When Coffey asked if Carothers was inside, Unger replied, "No." Coffey said, "Look, I know he's in there, why don't you tell him to come out and talk to me." Unger looked to his left and hesitated. Coffey testified that when Unger looked away and apparently lied, he did not want to hesitate or create a more dangerous situation, so he stepped into the apartment. Coffey immediately arrested Carothers for the robbery.

Carothers was taken to the police station, where he quickly confessed. The police then persuaded him to call his accomplice, whoever it was, and convince the accomplice to turn himself in. On the phone, Carothers talked loudly, often using the name "Matt." His conversation was overheard by the police. He told Unger, as he had been told by Coffey, that he (Carothers) had been positively identified from a photo lineup and that Unger would soon be identified as his accomplice. He also told Unger of his own confession to the police. Trooper McMillon, who was acquainted with Unger, then took the phone, said, "Hello, Matt," and persuaded Unger to turn himself in. Unger was given a ride to the police station and confessed immediately, no more than one and one-half hours after Carothers' arrest. Unger testified that he turned himself in after the call from Carothers and McMillon because he believed the police already knew that he was Carothers' accomplice.

Unger and Carothers moved to suppress their confessions as the fruits of an illegal arrest. The trial court concluded that the officers had probable cause to arrest Carothers, and that the confessions of both Unger and Carothers were voluntary. However, the court found that Unger had not consented to the entry of his apartment, and that, therefore, the warrantless arrest of Carothers was illegal. The judge based this ruling on the legal trend toward considering warrantless arrests in the home to be unreasonable under the fourth amendment, absent exigent circumstances, and on Alaska's constitutional right to privacy. Alaska Const. art. 1, § 22. The judge also found that no exigent circumstances were involved, since there was nothing to indicate that evidence was being destroyed or that Carothers would have escaped in the time it would have taken to get a warrant.

Nevertheless, based on the doctrine of inevitable discovery, the trial court ruled that the confessions of Unger and Carothers were admissible. Although Carothers' confession was the fruit of his illegal arrest, the court held that if the information would have been discovered in any event it would be admissible. The court found it certain that Carothers would eventually have been discovered and apparently assumed that the confessions would follow. This was the posture of the case when the parties stipulated to a *Cooksey* plea, preserving the question of whether Carothers' confession was admissible against Unger. *See Cooksey v. State*, 524 P.2d 1251 (Alaska 1974).

On appeal, the parties have reformulated the issues considerably. The state concedes that the arrest was illegal because it was effected without a warrant, violating both the rule of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (decided after the trial court's ruling in this case), and Alaska Const. art. 1, §§ 14 and 22. The state also concedes that Carothers' confession was the fruit of the arrest, under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and

*Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The state further concedes that the trial court erroneously applied the inevitable discovery doctrine to confessions, since confessions are not "evidence" to be discovered by police investigatory procedures; *nor are they "inevitable."* Finally, the state concedes that to apply the inevitable discovery doctrine to warrantless arrests would in effect nullify the protection of the warrant clause of the fourth amendment.

However, because this court may affirm the ruling of the superior court on any legal theory, *McGee v. State,* 614 P.2d 800, 805 n.10 (Alaska 1980); *Pistro v. State,* 590 P.2d 884, 888 n.13 (Alaska 1979), the state argues that the evidence obtained through the arrest should not be suppressed if the officers had a good faith and reasonable belief that an arrest warrant was not required. The state backs up this contention by arguing that *Payton v. New York* should not be applied retroactively so as to invalidate the search. It argues that even though the arrest is violative of the Alaska Constitution, art. I, §§ 14 and 22, reliable evidence should not be excluded if the police officers acted in good faith. It further argues that Alaska Rule of Evidence 412, excluding illegally obtained evidence, does not apply. We will examine each of the state's concessions and new contentions in turn.

## WARRANTLESS ARREST IN THE HOME

■ In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980),

the United States Supreme Court held for the first time that an arrest effected in a suspect's home with probable cause but without a warrant violates the fourth amendment. Such a rule had not been announced in Alaska.[1] Officer Coffey testified that he did not attempt to obtain a warrant for Carothers' arrest because he thought it was unnecessary since a crime had been committed and there was probable cause to believe Carothers had committed it.

The state concedes that the arrest in this case would be illegal if the *Payton* rule were to be applied.[2] The state further concedes its belief that the Alaska Supreme Court would follow *Payton* in construing the Alaska Constitution, art. I, §§ 14 and 22. We find, upon review of the record and the authorities, that the state has properly conceded these issues. *Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972).

The trial judge ruled in favor of appellants on the illegality of the arrest under the United States and Alaska Constitutions, correctly anticipating the *Payton* decision and, we believe, correctly interpreting the Alaska Constitution and prior Alaska Supreme Court decisions dealing with search and seizure. The court stated:

> [T]he warrantless arrest into Unger's home was illegal. I agree that the statute[3] does not require a warrant to effectuate an arrest in a home. The statute is silent as to the place where the arrest

1. At the time of the opinion in *Payton,* the appeal of appellant Carothers, but not of appellant Unger, was pending on direct review in this court.

2. Although the trial court did not make a specific finding of fact, the state conceded at oral argument that Carothers was a resident of Unger's apartment at the time of the arrest. Carothers testified that although he had not paid rent he had moved most of his possessions there three days previously, that he had equal access to the apartment, that he planned to stay indefinitely, and that he had been buying food for the residents. Thus, we are not confronted by the question of the legality of a warrantless arrest with probable cause in the home of another, a question specifically not

addressed in *Payton. Id.* at 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 649. More recently, the United States Supreme Court has held that, absent exigent circumstances, a search warrant must be obtained to effect an arrest of a person in the home of a third party. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

3. The statute referred to is AS 12.25.030, which states in part:

> *Grounds for arrest by private person or peace officer without warrant.*
> (a) A private person or a peace officer without a warrant may arrest a person
> . . . .

takes place. On the other hand I think it would be silly not to recognize the trend in the Alaska Supreme Court, and I think the—there is no doubt a general trend in the courts today toward holding that a warrantless arrest in a person's home is a reason—unreasonable per se under the U.S. Constitution's fourth amendment, absent exigent circumstances. Given the attitude the Alaska Supreme Court has taken on searches and seizures and their attitude towards Article 1, Section 22 of the Alaska Constitution's protection of privacy, I think the—it is almost certain that when the issue reaches the supreme court they will take the position that a warrant is necessary to effectuate an arrest inside a residence, absent exigent circumstances .... [I] think the—what the Alaska Supreme Court will do is clear and I think this court has an obligation to predict what that court will do and act accordingly.

In spite of the state's strenuous argument that the *Payton* rule should not be applied retroactively,[4] we find that appellants must be given the benefit of the lower court ruling, which correctly anticipated *Payton* and interpreted Alaska law. In *State v. Glass*, 596 P.2d 10 (Alaska 1979), the supreme court was confronted with a similar question. There, the retroactivity of a decision forbidding warrantless wiretapping with the consent of only one party was at issue. The supreme court held that its earlier ruling in *State v. Glass*, 583 P.2d 872 (Alaska 1978), should receive prospective application, but that *Glass* and three other defendants whose cases had been considered at the same time as *Glass* should receive the benefit of the new rule. One of the defendants, Thornton, had received a lower court ruling in his favor on the issue. The supreme court specifically indicated that a separate rationale would justify conferring the benefit of its initial ruling upon him. Thus, the court stated:

In *Thornton*, the *state*, not the defendant, petitioned for review of an order granting a motion to suppress. Judge Blair, who heard the suppression arguments in *Thornton*, suppressed the results of the warrantless participant monitoring anticipating, in effect, our holding in *Glass*. In fact, it was Judge Blair, in a well-reasoned decision, *State v. Glass*, 583 P.2d at 882, who had initially suppressed the tapes in *Glass*, and our decision affirmed his suppression order. Thus, the law, as applied to *Thornton*, has always been in conformity with the *Glass* decision. In *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969), the court gave primarily prospective application to its holding, but noted:

However, it is not our intent to disturb previously ordered suppressions of evidence anticipating our holding today.

*Id.* at 12 n.4 (emphasis in original). We believe that Unger's and Carothers' situation is similar to Thornton's and that the same benefit must be applied here, since the

---

(3) when a felony has in fact been committed, and he has reasonable cause for believing the person to have committed it.

4. The state further contends that the Supreme Court is likely to extend the logic of *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), to give purely prospective relief, so that even the parties who raise an issue will be denied the benefit of the exclusionary rule. However, the Supreme Court did not follow this approach in *Payton*, nor did the Alaska Supreme Court in *State v. Glass*, 596 P.2d 10 (Alaska 1979). In *Payton*, the inapplicability of the exclusionary rule was argued but not decided, and this was viewed by the New York Court of Appeals on remand as an implicit rejection of the argument. *People v. Payton*, 51 N.Y.2d 169, 433 N.Y.S.2d 61, 64, 412 N.E.2d 1288, 1290, 1291 (1980). In *Glass*, the court

carefully considered the problems of retroactivity and prospectivity, and decided to apply the rule to three other cases that were considered at the same time as *Glass*, although not consolidated. While the state in *Glass* conceded that Glass should get the benefit of the new ruling, the decision was so broadly based on policy that we must infer that the court considered the issue. 596 P.2d at 12–13. *See also Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (pure prospectivity would likely have an "effect upon the incentive of counsel to advance contentions requiring a change in the law"); W. LaFave, Search and Seizure § 11.5 at 689–90 ("[i]t is undesirable that the expansion of constitutional rights occur only by dictum").

law as applied to Unger and Carothers has always been in conformity with *Payton*.[5] We do not think that the superior court's incorrect application of the inevitable discovery doctrine should deprive Unger and Carothers of its ruling correctly anticipating *Payton*.

## STANDING TO ASSERT A CONSTITUTIONAL VIOLATION

■ The state next argues that Unger has no standing to assert the violation of Carothers' rights, which eventually led to Unger's confession.[6] The state also argues that the law of standing has not been decided in Alaska. It contends that Evidence Rule 412 and relevant case law are neutral on the issue of standing and certainly have not eliminated the standing requirement; it argues that this court should impose a strict standing requirement in exclusionary rule cases.

The same issue was recently addressed by this court in *G.R. v. State*, 638 P.2d 191 at 203 (Alaska App., 1981), also involving admissibility of confessions obtained pursuant to an illegal arrest. There we relied on *State v. Sears*, 553 P.2d 907 (Alaska 1976), as well as Commentary to Alaska's new Evidence Rules, and we concluded that Evidence Rule 412 did not eliminate the requirement of standing in Alaska as to violations of fourth amendment rights. In the absence of clear Alaska precedent for aboli-

tion of the standing requirement, we turned for guidance to relevant federal case law; we do the same here.

The state asserts that under federal law, the benefit of the exclusionary rule has been restricted to the person whose rights were violated, therefore excluding Unger. However, we conclude that under federal law Unger's rights, and not only Carothers', have been violated. Although most comparable U.S. Supreme Court cases have involved the search of premises for evidence, their reasoning is equally applicable to illegal entry of premises and seizure of a person. *Payton v. New York*, 445 U.S. at 584, 100 S.Ct. at 1379, 63 L.Ed.2d at 650. In *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58 L.Ed.2d 387, 399 (1978), a recent Supreme Court case on standing, the Court stated:

> [T]he question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed upon an interest of the defendant which the Fourth Amendment was designed to protect.

*See also Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct.

---

5. The state also argues that although Unger's and Carothers' Alaska constitutional rights were violated, application of the exclusionary rule is not appropriate. The state contends that the standard for applying the exclusionary rule is whether the officers had a good faith and reasonable belief that their conduct was legal, citing *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), and *Stone v. Powell*, 428 U.S. 465, 540, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067, 1114 (1976) (White, J., dissenting on other grounds). Whether there should be such an exception to the rule is a hotly debated issue that has not been resolved by the United States Supreme Court. We need not reach this issue here because of our holding that Unger and Carothers should have the benefit of a lower court ruling in their favor. For the same reason we need not reach the state's arguments on the inapplicability of Alaska Rule of Evidence 412, excluding illegally obtained evidence.

6. The state also argues that Unger chose not to assert the violation of his own rights by the illegal entry, so that the only issue before the court is whether his confession is the fruit of the unlawful arrest of Carothers. The reply brief of appellant Unger disputes this strongly and urges that in any case Unger's primary right to privacy in the premises was violated. The trial court said at one point, "Unger clearly has standing to object to a search of his house .... Whether Carothers has standing to object to the entry of Unger's house ... is the issue in controversy." Since Unger objected to the admission of both confessions and the state did not argue below that he had no standing to object, we conclude that the issue was properly preserved as to Unger. *Cf. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38, 43–44.

2120, 20 L.Ed.2d 1154 (1968).[7] Since Unger meets the requirements set out in each of these cases, we conclude that Unger could contest the search under federal concepts of standing and, thus, has standing to assert his claims here.

## CONFESSIONS AS FRUIT OF AN ILLEGAL ARREST

■ There remains the question whether the connection between the unconstitutional police conduct and subsequent incriminating statements obtained after the illegal seizure was nevertheless sufficiently attenuated to permit the use at trial of the incriminating statements. *Dunaway v. New York,* 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 839–40; *Cruse v. State,* 584 P.2d 1141, 1145 (Alaska 1978); *G.R. v. State,* 638 P.2d 191 at 200 (Alaska App., 1981). *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The state argues that Unger's confession was so attenuated from the illegal arrest that the taint of the unlawful entry of his home had been dissipated,[8] although the state does concede that Carothers' confession was within the scope of the taint.

In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the supreme court set forth several factors to be examined in determining if the taint has been dissipated: the temporal proximity of the arrest and the confession, the presence or absence of intervening circumstances, the use of *Miranda* warnings (*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and the purpose and flagrancy of the official misconduct. 422 U.S. at 603–

04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 426–27. We must examine these factors as they apply to this case.

First, we note a close temporal proximity between Carothers' arrest and confession and the detention and confession of Unger. Carothers confessed immediately; Unger's confession followed within an hour and a half of the unlawful entry into Unger's apartment. Although the state asserts that the temporal proximity factor in this case is "neutral," we believe that "[t]he shorter the time, the more likely the taint of the illegal arrest has not been purged." W. LaFave, *Search and Seizure* § 11.4 at 633 (1979). We also note that in *Brown v. Illinois* the time elapsed between arrest and confession was less than two hours. 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 428. *But cf. Rawlings v. Kentucky,* 448 U.S. 98, 108, 100 S.Ct. 2556, 2563, 65 L.Ed.2d 633, 644 (1980) (where the "congenial atmosphere" of the 45-minute interval outweighed the fact that such a short lapse of time might not be sufficient to purge the taint). In addition, it is not necessary that the defendant be in custody for that period of time for the taint to continue. W. LaFave, *Search and Seizure,* § 11.4 at 634.

Next, the state argues that Carothers' call to Unger is a "significant intervening circumstance" within the meaning of *Brown.* Review of the record, however, clearly indicates that Carothers called Unger at the urging of Trooper McMillon and told Unger that he had been positively identified as the robber and had already con-

---

7. *Cf. Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (distinguishing, for the purposes of standing, the case of a person who placed contraband into the purse of a woman with whom he had no prior relationship and from whom he had not obtained consent to do so, from the case of co-occupants of a residence).

8. We note that at the superior court level the state conceded this issue and took the position that there had been "no attenuation of the taint by way of temporal non-proximity, intervening circumstances, or nature of the official misconduct to allow the introduction of evidence against Mr. Unger." We find merit in the ap-

pellant's argument that the state should not now be allowed to withdraw that concession on appeal, when factual development of the issue was foreclosed at the trial level and when the appellant entered into a *Cooksey* plea based upon the facts as stipulated. We note that, as it is presented here, the question is primarily factual, not legal. The trial judge addressed this issue only briefly, but it seems implicit in his decision that he concluded the confession was fruit of the poisonous tree. However, because of our holding that there clearly was not sufficient dissipation of the taint, we do not rely on the conclusion that the state is now foreclosed from withdrawing its concession.

fessed. McMillon took the phone, called Unger by name, and convinced him to turn himself in. The call was itself a direct result of the illegal arrest and therefore could hardly be considered as purging the taint. *G.R. v. State*, 638 P.2d 191 at 200 (Alaska App., 1981). *See also Cruse v. State*, 584 P.2d 1141, 1145 (Alaska 1978). We consider this situation to be distinguishable from that in *Rawlings v. Kentucky*, 448 U.S. at 108, 100 S.Ct. at 2563, 65 L.Ed.2d 644, where the defendant made spontaneous admissions in reaction to evidence discovered upon execution of a search warrant. Here there was no intervention by a neutral and detached magistrate, and the confession was the result of a telephone confrontation between Unger, the police and Carothers—a confrontation that resulted directly from exploitation by the police of their unlawful arrest of Carothers in Unger's home.

As to the "purpose and flagrancy of the official misconduct," it cannot be said that the officers' conduct was flagrant or that it had any prohibited purpose, because *Payton* had not yet been decided and AS 12.25.030 and 12.25.100 appeared to authorize warrantless home arrests. *See Rawlings v. Kentucky*, 448 U.S. at 109–110, 100 S.Ct. at 2563–2564, 65 L.Ed.2d at 645. In addition, Unger and Carothers were given *Miranda* warnings before their confessions. However, we are not persuaded that these last two factors are sufficient to dissipate the taint of the illegal arrest, particularly in view of the telephone call made by Trooper McMillon in exploitation of the arrest. On balance we find that Unger's confession was induced by Carothers' illegal arrest and detention, and that, given the close causal and temporal relationship between Carothers' unlawful arrest and Unger's subsequent confession, there is no basis for finding that the original taint had dissipated.

## INEVITABLE DISCOVERY

On appeal the state has conceded that the trial court erroneously applied the doctrine of inevitable discovery in the case of these confessions. It agrees with the position of appellants that a confession does not come within the common understanding of this exception to the exclusionary rule. We are persuaded that the state has correctly conceded this issue and that we should not uphold the superior court on this basis.

The principle underlying inevitable discovery is that evidence tainted by illegality will not be suppressed where the prosecution establishes that the evidence would have been discovered by law enforcement officials through the utilization of legal and predictably performed investigatory procedures, and without resort to illegal methods. LaCount and Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule*, 40 Alb.L. Rev. 483, 483 (1976). In effect, the inevitable discovery doctrine permits the state to introduce evidence that is clearly the result of an illegal search or seizure, upon a showing that the government undoubtedly would have discovered the tainted evidence by lawful means. Kamisar, LaFave and Israel, *Modern Criminal Procedure*, p. 702 (4th ed. 1974).

Few cases have dealt with the relevance of the doctrine of inevitable discovery to confessions. In *State v. McKendall*, 36 Or. App. 187, 584 P.2d 316 (1978), the court noted the importance of distinguishing between a confession and the information stated in it. Even if the state would have found comparable evidence of the same facts, the court held that a resultant confession must be suppressed after an illegal arrest. In *McKendall*, the defendant testified that she doubted she would have confessed; here Carothers stated that he had no intention of turning himself in, and Unger testified that he only confessed because of the phone call from Carothers. In neither case was there evidence in the record to show that Unger or Carothers would inevitably have confessed. *See also* W. LaFave, *Search and Seizure* § 11.4, 1981 Supp. at 132; Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 Calif. L.Rev. 579, 606–07 (1968).

We agree with the position of both parties that a confession cannot normally be considered the type of evidence that inevitably will be "discovered" by legal, predictable police procedures. Here, for example, it is entirely possible that, but for Carothers' unlawful arrest and the call that followed, Unger, if alerted to the police interest in him, would have consulted an attorney who would have advised him to exercise his right to remain silent; it is also possible that Unger would not have been as prone to confess if he had not witnessed the illegal entry of his own apartment and the warrantless arrest of Carothers. We therefore hold that the inevitable discovery doctrine was not applicable here.[9]

The decision of the superior court is REVERSED.

SINGLETON, J., not participating.

---

**9.** The state also agrees with Unger and Carothers that such broad application of the inevitable discovery doctrine to warrantless searches and seizures or warrantless arrests would effectively obliterate the warrant requirement of the fourth amendment. *See United States v.* *Griffin*, 502 F.2d 959 (6th Cir. 1974); W. LaFave, Search and Seizure § 11.4 at 624 (1979); LaCount and Griese, *supra* at 506; *see generally* Note, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Colum.L.Rev. 88 (1974).