Jeffrey MURDOCK, Appellant,

v.

STATE of Alaska, Appellee.

Manuel ROBINSON, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 5173, 5289.

Court of Appeals of Alaska.

May 27, 1983.

Christine Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant Murdock.

J. Randall Luffberry, Palmer, for appellant Robinson.

John A. Scukanec, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

COATS, Judge.

Jeffrey Murdock was indicted on October 6, 1978, on two counts of armed robbery, former AS 11.15.240 and former AS 11.15.295. These charges arose out of a robbery which took place in an apartment on September 30, 1978. Murdock was charged with committing this robbery with accomplices Manuel Robinson and Michael Hughes. Murdock was also charged with attempted armed robbery, former AS 11.05.020 and same statutes as above, and manslaughter, former AS 11.15.040. These charges arose out of an attempted robbery of a restaurant which took place later in the day on September 30, 1978. This crime was also allegedly committed with accomplices Robinson and Hughes. The trial court dismissed the manslaughter charge against Murdock on September 27, 1979. Murdock was ultimately convicted of one count of armed robbery and one count of assault with a dangerous weapon (as a lesser included offense of the armed robbery), former AS 11.15.220, as a result of the apartment robberies. He pled no contest to the attempted robbery charge that arose from the attempted restaurant robbery. Murdock was sentenced on January 14, 1980, to concurrent terms of twelve years for armed robbery, seven years for assault with a dangerous weapon, and five years for attempted armed robbery.

Murdock appeals to this court requesting us to reverse his armed robbery and assault convictions and remand the case for a new trial on these charges. He also requests that the court reverse his sentences for all charges and remand the case for resentencing.

Manuel Robinson was also indicted on October 6, 1978, for two counts of armed robbery for the apartment robbery, and for attempted armed robbery and manslaughter for the attempted restaurant robbery. The trial court dismissed the manslaughter charge against Robinson on September 16, 1979. Robinson was convicted of one count of armed robbery (for the apartment robbery) and one count of attempted armed robbery (for the attempted restaurant armed robbery). He was sentenced to five years imprisonment on the attempted armed robbery conviction, concurrent with ten years imprisonment with three years suspended for the armed robbery conviction. Robinson appeals his convictions and sentences.

Because Murdock and Robinson have raised some of the same points on appeal, we have combined their cases for purposes of this opinion.[1] We find that we must remand the convictions for further proceedings and thus do not reach the sentencing issues.

## FACTUAL BACKGROUND

Michael Cornett and Dennis Vandelaar picked up two juvenile prostitutes, J.L. and A.L., on Anchorage's Fourth Avenue on the night of September 29, 1978. After arriving at Cornett's Arctic Boulevard apartment, Cornett and Vandelaar refused to pay for the girls' services. One girl was allegedly raped by both men, and one was allegedly forced to disrobe and subjected to an attempted rape. The girls were then driven back downtown and dropped off in an alley. The girls related their version of what happened in the apartment to two friends—Michael Hughes and Manuel Robinson. Early on the morning of the 30th, Hughes, Robinson and their friend Murdock forced their way into Cornett's apartment, beat up Cornett and Vandelaar, and stole guns, ammunition, stereo equipment, jewelry, clothing and money from the apartment.

On the night of the 30th, Hughes, Murdock and Robinson attempted an armed robbery of Chino's Restaurant. Restaurant owner Joseph Hochong ("Chino") began shooting at the robbers, and was shot to death by Hughes while Hughes was trying

1. The third accomplice, Michael Hughes, was convicted of two counts of armed robbery for the apartment robbery. He has not appealed those convictions. Hughes was convicted of manslaughter and attempted armed robbery for his participation in the attempted armed robbery of Chino's Restaurant and the killing of restaurant owner Joseph Hochong. Appeal in these convictions is currently pending in this court. *Hughes v. State*, File No. 5217.

to escape. Murdock was captured by the police a few blocks from the restaurant and was identified at the scene of the crime. Hughes and Robinson escaped.

Robinson and Hughes left their residence after the attempted robbery of Chino's and moved in temporarily with acquaintance Keith Kmet until they could raise enough money to leave the area. On October 2, 1978, Anchorage police received an anonymous telephone tip. The caller stated that he had seen guns in apartment number three at 143 West Eleventh, and that one of these guns had been stolen from a friend of his. Officers Coffey and Smith went in plainclothes to investigate and saw the names K. Kmet and J. Bell on the mailbox. They learned from the police computer that a Keith Kmet, listed at a different address, had been a possible burglary suspect at an unspecified date, but was not wanted on any charges. The officers rang the doorbell about ten times without receiving an answer; then the door was opened by C.R., Kmet's fifteen-year-old live-in girlfriend. Officer Coffey asked C.R. if Kmet was home, and when she said that he was not, the officers showed her their badges and asked if they could come in to talk. She allowed them to enter. The officers entered the living room, and Officer Coffey saw A.L. seated on a couch, a pistol placed on a stereo speaker, and three empty gun holsters on the floor. Officer Coffey placed himself between the girls and the pistol and asked if C.R. and the other girl were the only ones in the apartment. C.R. said no one else was in the apartment; Coffey repeated the question. C.R. replied that only the two girls were there. He then heard what he though were suspicious, muffled, rustling noises. Leaving Officer Smith in the living room with the girls, he opened the door to the bedroom from which he thought the noises came. He observed a sleeping juvenile, J.L., in bed, Robinson apparently attempting to hide in the closet, and part of a rifle barrel projecting from underneath the bed. Coffey had experienced previous police contact with Robinson, including an arrest for armed robbery. He escorted Robinson to the living room.

Officer Coffey returned to the bedroom to retrieve J.L. He woke her up, allowed her to put some pants on, and was escorting her into the living room when he heard noises in the apartment's bathroom. He requested the occupant to come out, and five to ten seconds later Hughes emerged. Hughes and J.L. were placed in the living room with the others, and Officer Coffey reentered the bedroom to search under the bed. He found seven to nine rifles and shotguns under the bed, returned to the living room, and told Officer Smith to call in for backup officers. Officer Coffey seized the guns he had found under the bed, and two shotguns he found in the closet in which he had found Robinson. Upon being asked if anybody knew anything about these guns, the occupants replied they did not know anything about them. A general, warrantless search of the apartment was undertaken, which the state now indicates was unconstitutional. Later on, officers conducted a warrant search of the apartment.

## PEREMPTORY CHALLENGE

Murdock first argues that he should have been allowed to peremptorily challenge Judge Ripley, or at least have been able to more fully set out reasons why he should have been able to do so.

Peremptory disqualifications are set forth in the Alaska Statutes and Rules of Criminal Procedure. AS 22.20.022 provides in part:

> *Peremptory disqualification of a superior court judge.* (a) If a party or a party's attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath that a belief that a fair and impartial trial cannot be obtained, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the ac-

tion. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.

. . . .

(d) No party or his attorney may file more than one affidavit under this section in an action and no more than two affidavits in an action.

Alaska Rule of Criminal Procedure 25(d)(1) states:

*Entitlement.* In any criminal case in superior or district court, the prosecution and the defense shall each be entitled as a matter of right to one change of judge. When multiple defendants are unable to agree upon the judge to hear the case, the trial judge may, in the interest of justice, give them more than one change as a matter of right; the prosecutor shall be entitled to the same number of changes as all the defendants combined.

The Murdock, Robinson and Hughes cases were consolidated for pretrial proceedings. The case was originally assigned to Judge Ralph Moody, who granted Hughes' motion peremptorily challenging him. Although Hughes served Murdock's counsel with this motion, neither Murdock nor his counsel was consulted on the exercise of the peremptory challenge or was present when Hughes exercised the challenge. Judge Moody ruled that whichever defendant exercised the first peremptory challenge would be "the winner," and would thus exercise the peremptory challenge for the group. After Judge Moody was disqualified the case was assigned to Judge Mark Rowland, who was peremptorily challenged by the prosecution. The case was then assigned to Judge Justin Ripley. Murdock filed a motion to peremptorily challenge Judge Ripley. The state filed a motion objecting to the peremptory challenge, arguing that the defendants had already filed a peremptory challenge and that, under the rule, the three defendants were only entitled to one peremptory challenge. Judge Moody denied Murdock's request to disqualify Judge Ripley. Murdock then filed a motion objecting to the fact that Judge Moody had ruled on the motion, arguing

that Judge Moody had no authority to act on the case because he had disqualified himself. Murdock filed a memorandum in support of his motion. This motion was then extensively argued before Judge Ripley. After listening to argument, Judge Ripley indicated he would rule on the motion *de novo.* He then denied the motion to allow Murdock to peremptorily challenge him. Murdock then asked Judge Ripley to allow the defendants to show reason why they should be allowed additional peremptory challenges. Murdock alleged that the cases were factually different, that there were different legal issues in the various cases and that the individual attorneys had different ways of treating the various issues. Judge Ripley indicated that he had already been fully informed about those matters, had considered them, and had ruled.

■ Murdock argues two grounds in urging us to find the trial court abused its discretion. First, Judge Moody did not follow the procedure for peremptory challenges set out in *Hawley v. State,* 614 P.2d 1349 (Alaska 1980). In *Hawley* the supreme court stated that "the following procedure should be observed in multiple defendant cases. The trial court should inquire if this is a joint decision or, at least, require that the defendants confer before rendering its decision." *Id.* at 1361 n. 34. Second, Murdock argues that Judge Ripley abused his discretion in not allowing Murdock to show specific reasons why Judge Ripley should have allowed further peremptory challenges.

These grounds do not warrant an abuse of discretion finding. *Hawley* was decided well after the peremptory challenge issue arose in this case. Therefore, the trial court did not have the benefit of the *Hawley* language which set forth a procedure where multiple defendants were required to consult with each other before a peremptory challenge was exercised. Furthermore, in *Hawley* itself the court did not find an abuse of discretion where multiple defendants did not confer before exercising a peremptory challenge. *Id.* In any event, although the preferable procedure is to have

multiple defendants confer in reaching a decision to exercise a peremptory challenge, neither the peremptory challenge rule, the statute, nor the *Hawley* decision require the decision to exercise a peremptory challenge to be a joint decision. After the various defendants and counsel did confer after Judge Moody was peremptorily challenged, Hughes made no request to withdraw his challenge of Judge Moody. The only request was to allow Murdock to peremptorily challenge Judge Ripley. We fail to see how Murdock was prejudiced by his inability to confer with the other defendants before Hughes peremptorily disqualified Judge Moody, since it appears Hughes was determined to peremptorily challenge Judge Moody. We also conclude that Murdock had numerous opportunities in his various peremptory challenge motions and the argument on these motions to make specific allegations concerning the asserted conflicts that might have led Judge Ripley to grant additional peremptory challenges. There simply was no indication in the court below, nor has there been any suggestion on appeal, that there were any specific reasons why Judge Ripley abused his discretion in not granting an additional peremptory challenge. We note that Murdock made no attempt to disqualify Judge Ripley for cause.

■ We also note that, aside from the fact that Murdock had numerous opportunities to set forth specific reasons why Judge Ripley should grant additional peremptory challenges, there is a serious question whether the request for the trial judge to consider more specific reasons why he should disqualify himself after he ruled on the motion to disqualify himself was a timely request. Murdock's motion to peremptorily disqualify Judge Ripley was filed in December, 1978. This motion was argued and denied in March, 1979. Only then did Murdock ask to present more specific reasons why Judge Ripley should disqualify himself. Defendants should file motions to disqualify a judge within five days of when the judge is assigned to the case. Alaska R.Crim.P. 25(d)(2). Murdock's request to show additional grounds why Judge Ripley

should disqualify himself appears to have been untimely. *See Wamser v. State,* 587 P.2d 232, 235 (Alaska 1978). We find no abuse of discretion.

## STANDING

■ Murdock and Robinson raise several issues concerning the entry into and the search of the Kmet apartment. The state first contends that Murdock does not have any standing to complain about the search of the Kmet apartment. This court has ruled that a defendant must have standing to challenge a violation of search and seizure rights. *Unger v. State,* 640 P.2d 151, 156–57 (Alaska App.1982); *G.R. v. State,* 638 P.2d 191, 201–05 (Alaska App.1981). However, the state has waited until appeal to raise its standing objection even though Murdock clearly asserted that he had standing in his suppression memorandum filed in the trial court. On this record we must find that Murdock has established that he has standing. *See Unger v. State,* 640 P.2d at 156 n. 6. We conclude that the state has waived any objection that it might have had to Murdock's standing to raise the search and seizure issues.

## THE KMET APARTMENT ENTRY

■ Murdock and Robinson argue that the apartment entry was illegal because the officers did not have a valid consent to enter the apartment. Trial judge Justin Ripley decided that C.R.'s actions in admitting the officers into the apartment constituted a valid consent for the officers to enter. Therefore, we review the evidence in the light most favorable to the state. *Gray v. State,* 596 P.2d 1154, 1158 n. 18 (Alaska 1979). We conclude that the evidence was sufficient for the trial court to find that the state met its burden of proving a consent entry. C.R. had actual authority to allow the officers to enter the common-area of the apartment, since she was living in the apartment. Furthermore, it was reasonable for the officers to conclude that a teenage girl who answered the door and invited them inside had authority

to do so. *Doyle v. State,* 633 P.2d 306, 307–09 (Alaska App.1981). The facts of the entry are consistent with the trial court's conclusion that C.R. consented to the police entry and that the entry was not a product of duress or coercion.

## THE KMET APARTMENT SEARCH

The state contends that the initial search of the apartment was justified as a protective search. The trial court agreed, finding that "the record will clearly show that well-trained police officers, not responding to an unreasonable fear, properly moved through that apartment swiftly in the interest of their own safety ... I do not find ... from the facts before me that this was at all an orchestrated sham search."

■■ Alaska recognizes the protective search exception to the warrant requirement, but a) the officers must have reasonable cause to believe that their safety is in danger before engaging in such a search, and b) the search must be narrowly limited to areas where they could find dangerous persons. *Mattern v. State,* 500 P.2d 228, 231 n. 7 (Alaska 1972); *Taylor v. State,* 642 P.2d 1378, 1381–82 (Alaska App.1982). To show such reasonable cause to search, the state should "demonstrate a factual basis for a reasonable belief that additional suspects [beyond those under police control] were present and posed a threat to the safety" of the officers. *State v. Spietz,* 531 P.2d 521, 525 (Alaska 1975). In reviewing the trial court's decision, we review the evidence in the light most favorable to the state. *Gray v. State,* 596 P.2d at 1158 n. 18.

■ We conclude that the evidence was sufficient to justify a protective search in this case. There were specific articulable facts from which the trial court could conclude that the police officers had reasonable cause to believe their safety was in danger and that a protective search was necessary for the officers to protect themselves. The officers had a tip that a stolen gun was present in the apartment, in addition to numerous other guns. The police then learned that a burglary suspect possibly lived in the apartment. Upon entering the apartment, the police saw one gun and three empty holsters. Then, after being assured that no one was in the back of the apartment, the police heard noises from which they could have reasonably concluded that someone was present in the apartment. Given this situation, the court concluded that it was reasonable for the officers to fear that an armed suspect who could ambush them might be in the back of the apartment. Taking the evidence in the light most favorable to the state, we conclude the trial court did not err in finding that the protective search was justified.

Murdock argues that the police illegally seized various weapons from the Kmet apartment. The state argues that the weapons were in plain view. The trial court ruled that the weapons were in plain view.

■■ In order to establish that the guns were properly seized under the plain view exception to the search warrant requirement, the state had to prove at the suppression hearing that the officer's intrusion which afforded the view of the guns was lawful, that discovery of the guns was inadvertent, and that the incriminating nature of the guns was immediately apparent. *Deal v. State,* 626 P.2d 1073, 1078–79 (Alaska 1980); *Klenke v. State,* 581 P.2d 1119, 1121 (Alaska 1978). We do not find the trial court erred in ruling that the weapons were properly seized under the plain view theory. Officer Coffey knew of an anonymous tip that a large number of weapons were present at the Kmet apartment, and that one of them could be stolen. Upon entering the apartment, he saw one pistol and three empty holsters. He was told by the two girls in the apartment that no one else was present, yet when performing the protective search he found three other people, including Robinson, who was apparently trying to hide in a closet. Coffey saw a gun barrel under the bed in the room where he seized Robinson. We conclude that the trial court could find that for his own safety Officer Coffey had a right to seize the weapon that he saw under the bed and to

look in the closet where he found Robinson. The court could also find that in seizing the weapon which he saw under the bed Officer Coffey discovered the other weapons in plain view. Once Officer Coffey discovered that there were seven to nine rifles and shotguns hidden under the bed and two shotguns in the closet where Robinson had been hiding, it was reasonable for him to assume the weapons that he found were stolen. We therefore conclude that the trial judge did not err in finding that the weapons were properly seized.

■ After seizing the weapons, Officers Coffey and Smith searched the Kmet apartment. Many of the items that they found as a result of this search, including stereo equipment and a ring taken from Hughes, were later identified as property stolen in the Cornett-Vandelaar robberies. The state concedes that this search was unlawful. We agree.

■ Neither the state nor the defendants has adequately argued the effects of this illegal search to this court. We do not know what illegally seized evidence was used in trial or what evidence may have been the poisonous fruit of the illegally seized evidence. We therefore remand to the trial court the issue of what effect the suppression of this evidence should have.

### THE ADMISSION OF ROBINSON'S STATEMENT

■ After the police seized the weapons and searched the apartment, they took Robinson, Hughes, and the other residents of the apartment to the police station for questioning. All of these people, including Robinson, made statements. Robinson first argues that the police illegally seized all the other people who were present in the apartment and argues that therefore all evidence obtained against him as a result of their statements should be suppressed. However, on this record, Robinson has no standing to assert that the police violated the rights of Hughes and the others. In *G.R. v. State*, 638 P.2d 191, 201–05 (Alaska App. 1981), this court held that a defendant did not have standing to raise the fourth amendment rights of another where the defendant's own fourth amendment rights were not violated. Earlier in this opinion we upheld the trial court's decision that the police properly entered the Kmet apartment and conducted a protective search. Thus they properly encountered all the people whom they later questioned. Consequently, Robinson's fourth amendment rights were not violated by the original police contact with Hughes and the other residents. *See Unger v. State*, 640 P.2d 151, 156 (Alaska App.1982). Therefore, Robinson has no standing to argue that his rights were violated by any violation of the rights of Hughes and the other residents.

■ Robinson next contends that he was illegally seized and that his statement was illegally taken in violation of his constitutional rights to remain silent and to have counsel. In a related point, Robinson contends the trial judge erred in striking his testimony and Hughes' testimony which was offered on the question of whether Robinson's statement was legally obtained. We agree with Robinson that the trial judge erred in striking his and Hughes' testimony. Consequently, we are unable to review the issue of whether Robinson's statement was illegally obtained and must remand the case for redetermination of that issue.

■ Robinson and Hughes both testified concerning their detention by the police and the statements that they made to the police. Among other testimony, Robinson testified that he asked for an attorney before he made any statements, but the officers took no action on his request. During Robinson's and Hughes' testimony, which was given on the motion to suppress their statements, both defendants, on the advice of their counsel, refused to answer certain questions asked of them on cross-examination on the ground that the answers might incriminate them. When Robinson and later Hughes refused to answer in spite of the court's order to answer, the trial judge ordered their testimony stricken. The trial judge apparently did not consider their tes-

timony in reaching his conclusion that Robinson's statement was legally obtained.

We believe that the remedy of striking the entire testimony of Robinson and Hughes was too severe. We have indicated that we do not favor sanctions that result in the exclusion of evidence. *State v. Lewis,* 632 P.2d 547, 549–51 (Alaska App.1981). We have reviewed the record of the proceeding where Robinson and Hughes testified, and it does not appear that their invocation of their right to remain silent was in bad faith. Counsel for Robinson and Hughes both expressed concern that statements that their clients made during the suppression hearing might later be used against them.[2] The court specifically refused to rule to what extent the testimony of the defendants might later be used against them. While we do not suggest that the court acted improperly by not ruling on an issue that had not been briefed, the record reflects that counsel's concern that their clients' testimony might be used against them at trial was not frivolous. In any event, we see no reason why, in a pretrial hearing, the court could not consider the testimony of Hughes and Robinson even though they invoked the fifth amendment right to remain silent on some questions. We see no reason why the court could not consider their testimony while weighing the fact that they could not be fully cross-examined by the state. We believe that the inability of the state to fully cross-examine should go to the weight of the testimony but should not prevent Robinson's and Hughes' testimony from being considered at all. Accordingly, we find the trial court abused its discretion in refusing to consider the testimony of Robinson and Hughes in ruling on the motion to suppress Robinson's statement. The case is therefore remanded for the trial court to redetermine the issue of whether it should suppress Robinson's statement.

**2.** The hearing in this case took place before adoption of the evidence rules. The extent to which the testimony of a defendant may be used at trial is now covered by A.R.E. 104(d), which reads:

*Testimony by Accused.* The accused does not, by testifying upon a preliminary matter, subject himself to cross-examination as to other issues in the case. Testimony given by the accused at the hearing is not admissible against him unless inconsistent with his testimony at trial.

## THE SEARCH OF ITEMS THAT MURDOCK LEFT AT THE YMCA

Murdock argues that the trial judge erred in refusing to suppress evidence that was obtained by the police from possessions that Murdock had left at the YMCA. We hold the trial judge did not err in refusing to suppress the evidence.

At the time of his arrest, Murdock was renting a bed and storage locker at the F Street YMCA. When the YMCA manager heard of the arrest, to free up locker space she ordered a janitor to empty Murdock's locker, even though Murdock had paid the YMCA enough money to store his belongings in the locker for over two months. The locker's contents were placed in a general storage area. When two men attempted to claim Murdock's property, the manager became suspicious. She gave the property to a police officer, who took it from the YMCA to the police station. The officer did not open the property's containers (a suitcase, a satchel bag, a plastic bag, and a paper bag), and later gave the property to the investigator for Murdock's attorney. The attorney gave the property to the prosecution. The prosecution subsequently secured a search warrant to open the containers, based upon testimony concerning the observations of the janitor who had cleaned out Murdock's locker. Murdock's possessions included several items similar to those that had been stolen in the Cornett apartment robbery.

 Murdock correctly argues that he had a reasonable expectation of privacy in the property stored at the YMCA. He next contends that the YMCA had no authority to give the property to the police on its own initiative, and that the property was thus illegally seized. This argument has no merit, since the police gave the prop-

erty to Murdock's attorney (who later gave it to the prosecution). Murdock does not allege that while the property was in police possession the officers looked into the containers, or that the prosecution used information obtained from the seized property to obtain the subsequent search warrant. The initial seizure therefore did not taint the subsequent warrant search.

■ The only real issue is whether there was probable cause to support the search warrant issued by Judge Victor Carlson which enabled the police to search Murdock's possessions. The transcript of the testimony presented in the application for the search warrant shows that Murdock was definitely linked to the Cornett apartment robbery; that there was still unrecovered stolen property from that robbery; and that the janitor who had observed Murdock's property while removing it from the YMCA locker told the testifying officer that the items included a brown leather gun belt and holster and a small radio or portable tape player. The officer stated that the janitor observed "larger caliber cartridges" in the gun belt, such as .38 or .44 caliber. The robbery victim was missing a small cassette tape player, a brown leather gun belt and holster, and .357 or .38 caliber cartridges placed in the gun belt. On the above facts, Judge Carlson did have probable cause to issue the warrant.

■ Murdock contends that the judge's determination rested upon inaccurate and incomplete information. First, the judge was not informed that YMCA checkout card records indicated that Murdock had not slept at the YMCA between the time of the robbery and the time of his arrest. *Cruse v. State,* 584 P.2d 1141, 1146 (Alaska 1978) (footnote omitted) emphasized that "[p]olice and prosecutors owe a duty of candor to the court [considering the issuance of the search warrant], particularly in light of the *ex parte* nature of these proceedings, and must not withhold information which may taint the source of the probable cause they put forth." *See Gallagher v. State,* 651 P.2d 1185, 1188 n. 6 (Alaska App.1982). The *Cruse* test states

that before the court invalidates a warrant on the basis of concealment of facts, the court must find that the omission of information materially influenced the issuance of the warrant. 584 P.2d at 1146. The withheld information in question was not significant under *Cruse,* since Murdock would not have to have slept at the YMCA to have placed the stolen goods in his locker. Thus, it does not seem that the information would have influenced the judge, and its omission was not material. *See Gallagher,* 651 P.2d at 1187–88. Second, Murdock argues that the state presented no information showing that Murdock had visited his locker during the relevant time period. This also is not that important, since there was no significant reason to believe that Murdock or an agent of his had not visited his locker. Third, Murdock contends that the janitor provided only vague descriptions of the stolen property. However, we conclude that the descriptions were detailed enough to establish that the items that the janitor observed were property stolen in the robbery. Fourth, Murdock asserts that the janitor later testified at trial that he only remembered seeing the holster. This is an out-of-context statement. The janitor's complete testimony shows that he remembered the holster, gun belt and bullets at the time of his subsequent testimony. From this testimony it appears more likely that he had forgotten about the radio or tape player by the time he testified at trial than it does that the officer falsely testified at the warrant hearing as to what the janitor had earlier told him (when the observations were more freshly imprinted in the janitor's mind). Fifth, Murdock correctly asserts that the janitor did not specify the caliber of the bullets. But at the warrant hearing, the officer testified that "[the janitor] didn't specifically say, you know, that they were a certain caliber . . . ." It appears that Judge Carlson knew that the ".38 or .44 caliber" description was the officer's interpretation of the janitor's less detailed "larger caliber" description. We conclude that the search warrant was properly issued and find no error.

## CROSS–EXAMINATION OF MICHAEL CORNETT

■■■■■ Murdock argues that the trial court unduly restricted his cross-examination of Michael Cornett, one of the alleged victims of the apartment robbery. At trial, Cornett testified about Murdock's participation in the robbery. He also testified that he had not touched the teenage prostitute friends of Hughes and Robinson and denied that he sexually assaulted them. Murdock attempted to impeach Cornett's credibility on these points. Murdock wished to show that Cornett was a biased witness who had an interest in testifying favorably for the state. To demonstrate this bias, Murdock wished to show that Cornett had a long history of criminal charges and that most of these charges had been dismissed or had resulted in lenient dispositions. Murdock argued that Cornett thus had reason to exaggerate his testimony for the prosecution in repayment for past leniency and in anticipation of other favors from the prosecution in the future. Judge Ripley refused to allow this line of cross-examination. We have examined the record and conclude that Judge Ripley did not abuse his discretion in limiting the cross-examination in this area. We find that Judge Ripley did allow Murdock to adequately bring to the attention of the jury Cornett's reasons for bias in favor of the state.

There is no question that Murdock had the right to demonstrate Cornett's possible bias. The supreme court has "consistently held that it is essential to a defendant's right to a fair trial that he be allowed every opportunity to show bias on the part of a witness testifying against him." *Braham v. State,* 571 P.2d 631, 645 (Alaska 1977), *cert. denied,* 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978). *See Davis v. Alaska,* 415 U.S. 308, 316–18, 94 S.Ct. 1105, 1110–1111, 39 L.Ed.2d 347, 353–55 (1974); *Whitton v. State,* 479 P.2d 302, 318 (Alaska 1970). However, the trial court does have discretion at some point to limit impeachment evidence when that evidence is cumulative. *United States v. Nunez,* 668

F.2d 1116, 1123 (10th Cir.1981); *Robinson v. State,* 593 P.2d 621, 624 (Alaska 1979); *Braham v. State,* 571 P.2d at 648.

We note that Judge Ripley found that there was no indication that Cornett had received past favors from the police or that Cornett had cooperated with the police in the past. This finding is supported by the record. The evidence of a history of lenient dispositions would clearly be stronger evidence of bias if there was also evidence that these lenient dispositions had been received in return for past cooperation.

Judge Ripley permitted defense cross-examination on the fact that the state granted Cornett immunity against prosecution for possessing stolen guns[3] and was not prosecuting him for his alleged sexual assaults on the young prostitutes prior to the apartment robbery. We believe that it was thus sufficiently clear to the jury that Cornett was being treated favorably by the prosecution in return for his testimony. The history of lenient dispositions could perhaps raise an inference that Cornett had received favorable treatment in the past and hoped for favorable treatment in the future, and thus was biased in favor of the state. However, we conclude that the trial judge did not abuse his discretion in deciding that the probative value of the evidence was outweighed by its prejudicial effect, including the danger that collateral issues concerning Cornett's past criminal record and cooperation or non-cooperation with the police would confuse the main issues before the court. A.R.E. 403. The fact that the evidence was cumulative to other evidence, and the fact that its probative value was limited, support the trial court's decision to exclude the evidence.

■■■■ Later in the trial Murdock desired to cross-examine Cornett on three specific past charges—assault with a dangerous weapon, assault and battery, and inciting a young woman to pass five bad checks. Cornett had testified in response to leading questions on cross-examination that he had not hit or threatened to hit the young pros-

---

**3.** Some of the guns stolen from Cornett in the apartment robbery were stolen to begin with.

titutes because he did not do that type of thing and it was against his principles. Murdock wanted to introduce these three charges to help demonstrate to the jury that Cornett would use actual or threatened violence to commit sexual assault against the young prostitutes. This would serve two related purposes, according to Murdock: a) help bolster the bias theory by tending to show that Cornett was unafraid of prosecution for the alleged sexual assaults, *not* because he was innocent of the assaults but rather because of the state's informal grant of immunity, and b) act as a general rebuttal of Cornett's statement. The court found that the impeachment value of such cross-examination would be minimal, that the three charges did not demonstrate that Cornett would commit or threaten violence against young girls, and that such cross-examination would open up redirect examination on the charges, which would waste trial time. Murdock asserts that the rulings limiting his cross-examination of Cornett violate his sixth amendment confrontation right and Alaska Rule of Evidence 613(a), which allows evidence of witness bias or interest to be admitted to impeach the credibility of the witness.

Murdock asserts that without evidence of the three aforementioned charges, the jury could have concluded that Cornett was not fearful of prosecution for the alleged sexual assaults because he actually had not committed them, rather than because of a *de facto* immunity which would motivate bias. Murdock argues that if the jury had known that Cornett had been violent, or had asserted his will on a young woman to incite her to commit a crime, it would have been more likely to believe that Cornett had used actual or threatened violence to commit sexual assault upon the young prostitutes, needed immunity from prosecution for this incident, and was thus biased toward the prosecution because of his self-interest.

There are four problems with the probative value of such evidence. First, the two violent incidents were not directed against young women. In context, Cornett's testimony was to the effect that he did not threaten or commit violence against young women. Second, Murdock did not show that the inciting incident, which did involve an eighteen-year-old woman, involved threatened or actual violence. As the trial judge concluded, it is thus questionable whether these three incidents did substantially impeach Cornett's statement. Third, Cornett would be frightened of a sexual assault prosecution even if he had not committed the crime. The two girls had testified under oath that Cornett did sexually assault them, and at a trial it would have been their story against Cornett's and Vandelaar's story. In terms of his desire for immunity from prosecution, the fact that Cornett was *accused* under oath of sexual assault by two victims was arguably as important as whether he had actually threatened or used violence against them. Fourth, as Murdock's own counsel pointed out, even if the sexual activity with the juveniles was consensual, Cornett still could have been found guilty of a statutory rape of one of the juveniles. *See* former AS 11.15.120(2). Thus whether or not Cornett had used or threatened violence, he still desired immunity from prosecution for his asserted misconduct.

When these factors are combined, it appears that the three charges had little extra probative value for determining Cornett's desire for immunity and his consequent bias toward the prosecution. Thus, we find Judge Ripley did not abuse his discretion in concluding that Murdock's bias theory did not mandate admission of the three incidents.

■ Once past the bias issue and into the area of general rebuttal, the judge's discretion is enlarged. For the judge to refuse to allow Murdock to use the three prior charges as extrinsic evidence to contradict Cornett's testimony on a clearly collateral issue (whether he would use actual or threatened violence against young women) does not constitute an abuse of discretion. *Moss v. State,* 620 P.2d 674, 676–77 (Alaska 1980); *Jones v. State,* 576 P.2d 997, 999–1000 (Alaska 1978); *McCormick's Handbook of the Law of Evidence* § 47, at

98 (E. Cleary ed. 2d ed. 1972). We find no error.

## SENTENCING

Both Murdock and Robinson argue that their sentences were excessive and that Judge Ripley improperly sentenced them in anticipation that they would be paroled at particular times. *See Kelly v. State,* 622 P.2d 432, 438 (Alaska 1981); *Jackson v. State,* 616 P.2d 23, 24–25 (Alaska 1980). We have already decided to remand these cases to allow the trial court to determine if Robinson's confession was obtained illegally and to determine whether Robinson's and Murdock's convictions must be reversed because they were tainted by illegally obtained evidence. We therefore do not reach the sentencing issues raised by Murdock and Robinson at this time. We note, however, that the state concedes that Robinson's case must be remanded for resentencing because the trial court improperly fixed his sentence in anticipation of early parole. Although we do not decide this issue at this time, we do not preclude the trial court from resentencing either or both defendants in the event the trial court decides' the issues remaining in this case adversely to them.

The case is REMANDED for further proceedings.

BRYNER, Chief Judge, concurring in part and dissenting in part.

I dissent from that portion of the majority's opinion which upholds the warrantless seizure of guns by police officers from the bedroom of Kmet's apartment.

I accept the conclusion of the trial court that the initial police entry of the bedroom in Kmet's apartment was authorized under the protective search exception to the warrant requirement. The need to enter the bedroom to assure the safety of the officers could not, however, justify reentry of the bedroom to search for weapons. Alaska cases dealing with the protective search exception to the warrant requirement consistently hold that a valid protective search (a) must be based on a reasonable belief by officers that they are in danger and (b)

must be narrowly restricted to the purpose of assuring their safety. *Mattern v. State,* 500 P.2d 228, 231 n. 7 (Alaska 1972); *State v. Spietz,* 531 P.2d 521, 525 (Alaska 1975); *Taylor v. State,* 642 P.2d 1378, 1381–82 (Alaska App.1982).

Once all persons were removed from the bedroom and it was ascertained that there was nobody else present in the apartment except for those individuals detained in the living room, there was no longer any reason to believe that a gun located in the bedroom posed any danger to investigating officers. Reentry and search of the bedroom for weapons cannot be deemed to have been narrowly restricted to the purpose of protecting the safety of investigating officers, especially in light of the fact that the officers initially entered Kmet's apartment in response to an anonymous and unverified report of a stolen firearm. The seizure of the weapons was simply not necessary for the officer's protection. *Ellison v. State,* 383 P.2d 716, 719 (Alaska 1963).

Nor does the plain view exception to the warrant requirement justify reentry of the bedroom and seizure of the weapons. During the initial entry, Officer Coffey observed only a portion of one gun barrel protruding from under the bed. Neither the anonymous tip received by the police nor any of the circumstances observed by Officer Coffey at Kmet's apartment sufficed to establish probable cause that the gun barrel in the bedroom was from a stolen weapon. Furthermore, there is nothing whatsoever to support a finding that plain view could have justified a full search of the closet in the bedroom or, for that matter, of the entire area under the bed.

The incriminating nature of the guns seized from the bedroom was not immediately apparent when they were first observed, and, with the sole exception of the gun whose barrel was protruding from under the bed, it does not appear that any of the guns were discovered inadvertently. Under these circumstances, the plain view doctrine is inapplicable. *Deal v. State,* 626 P.2d 1073, 1078–79 (Alaska 1980); *Klenke v. State,* 581 P.2d 1119, 1121 (Alaska 1978);

*Anderson v. State,* 555 P.2d 251, 258–62 (Alaska 1976).

The majority opinion, as I read it, attempts to combine protective search and plain view in order to justify seizure of the guns. I believe that in so doing the opinion loses sight of the inapplicability of either theory when considered individually. No effort is made by the majority to explain how reentry of the bedroom to seize the initially observed weapon was a necessary measure to assure the safety of investigating officers. Similarly, there is no explanation to justify the court's conclusion that discovery of a number of guns established probable cause to believe that the guns were stolen.

I am particularly concerned with the application of the protective search exception to these circumstances. Unless the protective search doctrine continues to be applied only to those situations where a warrantless search is actually necessary to assure the personal safety of officers or others, the doctrine could become an exception that swallows the rule prohibiting warrantless searches. The warrant requirement applies with particular force to searches of homes. Especially in instances where police officers, acting on no more than an unconfirmed tip, solicit an invitation to enter the living room of a home, I believe that use of the protective search doctrine to justify repeated entry of private areas in the home, which are known to be unoccupied, for the purpose of seizing weapons constitutes a substantial and impermissible encroachment on the warrant requirement.

Since I believe that the record currently before the court is not sufficiently clear to allow accurate determination of relevant evidence ultimately obtained as a result of seizure of the guns from the bedroom, and since I further believe that a finding of harmless error cannot meaningfully be made without such a determination, I would remand this case for hearings concerning the extent of the evidence derived from the improper seizure of the guns.

I concur in the balance of the court's opinion.